THE STATE OF KANSAS, *Appellee,* v. GLEN ADAMS, *Appellant.*

No. 17,535.

### SYLLABUS BY THE COURT.

1. ADMISSIONS—*Voluntary Statements Admissible.* Statements made by one charged with murder to a county attorney and county commissioner, giving in detail the facts of the crime, are properly received in evidence when there is no showing that such statements were procured by duress, promise of reward, or other improper means.

2. EVIDENCE — *Shoe-tracks Admissible.* The description and measurement of tracks at the scene of the crime which correspond with the shoes worn by the defendant and introduced in evidence are competent.

3. BLOODHOUNDS — *When Conduct of Admissible as Evidence.* Before evidence of the conduct of bloodhounds alleged to have

been put upon the trail of the defendant can properly be received it should appear that the dogs in question were able, at the time and under the circumstances, to follow the scent or track of a person. When such foundation has been laid and the evidence showing the conduct of the dogs has been received, a charge in substance that before the jury can consider such conduct they must find that the dogs in question were accurate, certain and reliable in following the trail of human footsteps, and if they find from the evidence touching the matter that they were and are reliable and accurate in this regard then the evidence of their work and its result may be considered, together with all the other evidence in the case, as a circumstance determining the guilt of the defendant, is not prejudicially erroneous as to such defendant.

4. ———— *Weight of Such Evidence for Jury.* While the competency of such evidence must be determined by the court before its admission and not left to the jury, still after its admission and after cross-examination or rebuttal it may become so weakened that the jury should disregard it.

5. ———— *When Conduct of Bloodhounds Should Not be Considered.* If a proper foundation for such evidence be subsequently so weakened or destroyed as to render the jury unable to find that the dogs were able to take or follow the trail in question, then the evidence of the conduct of such dogs should not be considered and the quoted instruction was proper.

Appeal from Graham district court. Opinion filed July 7, 1911. Affirmed.

*John L. Crank,* and *Turck & Pedroja,* for the appellant.

*John S. Dawson,* attorney-general, *J. L. Colvin,* county attorney, and *W. L. Sayers,* for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant was convicted of the murder of Joseph Anderson, who lived about six miles from where the defendant worked for another farmer named Huntington. The state sought to show that between eight o'clock and midnight of the 8th of November, 1910, the defendant went to the home of Joseph Anderson and shot him, and then returned to

his place of abode.   The testimony showed that the defendant was at the Huntington house on the evening in question, and the persons remaining there that night, while they heard a sound as of some one moving about early in the evening, did not know of his absence, and he was there the next morning as usual.   Tracks similar to those made by the shoes worn by the defendant, which were introduced in evidence, were found upon the premises where the shooting occurred, and from the description and measurements correspond fairly well with the shoes themselves, and the evidence touching this matter was properly received.

On the day of his arrest the defendant was called to the county attorney's office, and was put under oath and through the form of a prohibition inquisition, but the answers given to the questions propounded were not in any wise criminating, and it is not clear why they were introduced in evidence.   Neither is it clear why this method was sought to be used to obtain statements from one recently arrested on a charge, as it was at first, of shooting with intent to kill.   From some motive or by some influence practically impossible to determine from the evidence, the defendant, on November 12, wrote and handed to the county attorney a letter addressed to one Fred Harvey, as follows:

"HILL CITY, KAN., Nov. 12, 1910.

"*Dear Friend Fred:*   I thought I would write you a few lines about this case, asking you kindly to go my bond of $2000.   I know it is a big thing to ask from you, but I will be very much pleased if you do so.   Now, I will tell you all about it, and it will be true.   I went up there and shot Joe Anderson because they accused us boys of going into Prairie View schoolhouse about six years ago, and I have no use for them.   I thought that would be a good way to get even with them.   That is all for this time.   From

Very truly yours,        GLEN ADAMS."

On the same day certain statements were made to the county attorney to the effect that on the night in ques-

tion the defendant went north to the corner east of Joseph Anderson's, then west a mile; set the straw pile on fire first, then set the barn on fire, and when Anderson came out with a bucket of water and threw it on the fire, and was leaving, the defendant shot him and went east and north of the house and shot twice from the east end of the porch; that when he shot the first time Anderson exclaimed that he was killed; that he did not leave until Anderson came out and went down the road; that when the defendant left he went south, and did not go back the same way he came up. One of the county commissioners testified that the county attorney sent for him and hold him that the defendant wanted to tell him about the affair, and when asked if he did the deed said, "I did." When asked how he came to do that, he said he had been accused of going into the Prairie View schoolhouse by Sam Anderson, and that he shot Joe because he could get at him better than he could Sam; that Sam had a family; that he set the stack on fire to attract his attention; that he did not come out, and he set the barn on fire and then he did come out, when he shot him; that he went around in front of the house, in east of the porch, where Anderson was lying on his elbow, and shot at him twice; that he had four shells, but one he could not get into the gun; it was jammed; that he would have shot him with that; that he went east and was passed by Anderson within about fifty yards south of the road.

Some contention was made that these statements were improperly procured, but after an investigation of the matter they were allowed to go to the jury, and we think properly so. A gun was found at the Huntington place at the time of the arrest which had the appearance of having been recently shot and of having dust or weeds jammed into the muzzle.

It is strenuously insisted that the evidence of the alleged tracking of the defendant by certain bloodhounds was improperly received and improperly in-

structed upon. Bloodhound evidence has been viewed differently by different courts. The supreme court of Nebraska, in *Brott v. State,* 70 Neb. 395, repudiates such evidence as incompetent and dangerous. Other courts have given various expressions as to the foundation necessary to be laid in order to render such evidence competent. These decisions, with notes, may be found in *Parker v. The State,* 46 Tex. Crim. Rep. 461, 3 A. & E. Ann. Cas. 893; *Richardson v. The State,* 145 Ala. 46, 8 A. & E. Ann. Cas. 108; *Hargrove v. The State,* 147 Ala. 97, 10 A. & E. Ann. Cas. 1126.

In *State of Ohio v. Thomas Hall,* 4 Ohio Dec. 147, the subject is treated historically, and the use of bloodhounds for scenting and tracking enemies or fugitives is shown to have been in vogue hundreds of years ago. It was there held that bloodhounds trained to follow human tracks could be shown to have been put upon the scent or track of a person twenty-four hours after a burglary, at the building or at a place where stolen property was concealed, and that they followed such track or scent up to the door of the defendant.

In *State v. Dickerson,* 77 Ohio St. 34, the supreme court of Ohio goes at length into the leading cases and the different rules laid down, and deduces the following as the correct one:

"It is apparent that before the acts and conduct of the dog can be shown, a proper preliminary foundation must be laid, and to establish such foundation it must be shown that the particular dog used was trained and tested in tracking human beings, and by experience had been found reliable in such cases; that the dog so trained was laid on the trail, whether it was visible or invisible, at a point where the circumstances tended clearly to show that the guilty party had been, or upon a track which the circumstances indicated to have been made by him. In addition to this the reliability of the dog must be proved by a person or persons having personal knowledge thereof." (p. 69.)

It seems anomalous to confront one charged with murder with the evidence of the way certain dogs acted, that is, with a description of such action by one who observed it. Before such testimony can be of any rightful use it should appear that the person testifying is reliable; that the dogs whose actions are to be described were able to scent a track under the given circumstances, and that they did follow such scent or track to or towards the location of the defendant. When all this is established, we then have this conduct from which to draw the inference that the defendant was at the place in question, a lesson in location taught by the exercise of canine instinct. It can be no proof of guilt, only some evidence that the party charged was at the place where the crime was committed, and hence where he could have committed it. Evidence of so uncertain and peculiar a kind should not be received unless and until the court is satisfied that the dogs in question were of such character and training that their conduct should be regarded by the jury as worthy their consideration. The competency of such evidence is for the court, and then, if received, its weight is for the jury.

The shooting must have occurred from fifteen to eighteen hours before the dogs arrived. It was very dry and a number of persons were and had been around the premises. The preliminary proof was in substance as follows: Elmer Lance testified that he lived at Phillipsburg, and at the present time was keeping and training bloodhounds for the purpose of running down criminals; had two English bloodhounds, purchased them about three months before, had charge of them and had had them on different trails; worked them in Graham and Smith counties and at Phillipsburg; his method being for a person to make a trail, and after a while start the dogs, and they have always found the person or party; brought the dogs to Graham county November 9; got to Joseph Anderson's between two and

three P. M.   There were several people there.   Tracks
were pointed out to him that he placed the dogs upon,
near the straw stack; he used lines or leashes secured
by a harness.   He started at the straw stack; no one
informed him of the footprints and he did not notice
them; finished his work after dark; before that he
knew the arrest had been made.   These dogs had made
a successful hunt on a trail ten or twelve hours old;
he did not know of his own experience whether dogs of
that nature would follow a trail sixteen or eighteen
hours old, but was generally acquainted with blood-
hounds and their work and knew from his acquaintance
with the character of bloodhounds that they will follow
a trail sixteen or eighteen hours old.   That one time he
was called to Bellaire on a bank robbery case.   Would
follow a trail twelve hours old as readily as one only
a few hours old but not work so fast.   From his knowl-
edge of bloodhounds he can state whether he is actually
following a trail with confidence and certainty by the
way the dog acts.

While this is none too satisfactory, we can not say
that the trial court erred in holding it a sufficient
foundation for showing how the dogs acted.   This was
shown in substance as follows:   Worked with their
noses close to the ground; pulled witness right along;
went from the straw stack a little southeast to the road;
went south to the first cross-roads, then west; had not
gone but a short distance until witness discovered by
their actions that they were not upon the trail.   He
worked them on each side of the road for the purpose of
catching the trail, which they did not strike after they
followed west of the road; he then worked them quite
a while on each side of the road, and concluded to start
from where he thought they had lost the trail, and
brought them back to the cross-roads where they
seemed to pick up the trail going south.   They went
almost to the next corner, where he concluded to water

them as they were very thirsty; brought them back; went north a little bit and the dogs started again and went in a southeast direction crossing the prairie until they struck a large draw, which they followed until reaching the section line; there went east into a wheat field or corn field sowed in wheat, and in a southeast direction, part of the time going south. In going south came to a large draw where the road made a bend, got across on south side where they made an angle to the southwest corner of the section line; there went south and at the next turn into a man's place in a lane that led to the barn and around a coal box and quite near this coal box and up to the door of the house.

On cross-examination he testified that he had never bred any bloodhounds but these were a year old; that he was not looking for tracks except at the straw stack; that he saw no tracks in the wheat field; he had been informed that they had arrested someone down at Huntington's; that these dogs traced a human track for him nineteen hours after it had been made; that at Bellaire he placed them upon a track of a supposed criminal which they traced to the railroad track; that no one was arrested because it was found that the parties had taken an automobile at that point.

The house where the dogs brought up was the house where the defendant stayed. It is evident that if the dogs started on the right trail they soon lost it, but it seems that the master was confident that they caught it again and followed it to the Huntington house. While this evidence was quite uncertain as to character and still more uncertain as to value, it was something which under proper instructions might properly go to the jury for such weight and credence as they thought it entitled to. This was the instruction:

"Evidence has come to you tending to prove that some fifteen or sixteen hours after it is alleged the deceased was shot, bloodhounds were put on certain

tracks, believed to have been made by the one guilty of the shooting; that they followed them for several miles, ending their trailing at the home of James.Huntington, where defendant was staying. Before this evidence can be considered by you as a circumstance tending to connect the defendant with the crime, it must be shown that the particular dogs were and are reliable and accurate and certain in following the trail of human footsteps. So, if you find from the evidence given touching the matter here that they were and are reliable and accurate in this regard, then the evidence of their work and its result on the day in question may be considered by you, together with all the other evidence in the case, as a circumstance determining the guilt of the defendant."

This amounted to a charge that the conduct of the dogs could not be considered at all unless the jury found that they were reliable and accurate in following the trail of human footsteps, thus leaving the jury to judge both of the competency and the weight of the evidence. This is the more clearly indicated by the expression "So, if you find from the evidence touching the matter here that they were and are reliable and accurate in this regard, then," etc. But as the court had already allowed this evidence to go in after the state had laid the foundation hereinbefore indicated, it was not error prejudicial to the defendant then to leave the jury free to disregard all the evidence on this point unless they found the dogs accurate and reliable. Indeed, this sort of instruction may have been proper in view of the weakening effect which the cross-examination may have had upon the foundation and evidence produced by the state, for evidence rightfully received upon a proper foundation being laid by the state may be afterwards so weakened by cross-examination or rebuttal that the jury not only may but should disregard it. The tracks and the confession of the defendant indicated and showed that he was at the place where the crime was committed, and if the jury

received any additional light from the character and conduct of the bloodhounds its effect may have been cumulative and not controlling. With such foundation as was laid, followed by the quoted instruction, it is not clear that in the reception of this somewhat peculiar evidence any material error was committed against the defendant. The accuracy and reliability of the dogs should have been considered with reference to the time and conditions of their conduct in this case; but an instruction that the jury must find them accurate, certain and reliable in tracing human footsteps includes their qualification in these respects generally, and also specifically as applied to the facts of the case under consideration, and is therefore as favorable to the defendant as if limited in the way suggested.

The judgment is affirmed.

BENSON, J. (dissenting) : I dissent from that part of the opinion which discusses the evidence relating to bloodhounds and their use. In my opinion that testimony ought to have been excluded. I also dissent from the approval of the instructions given on that subject.

As it is impossible to say that appellant would have been convicted without the evidence and instructions referred to, the judgment should be reversed and a new trial awarded.

Mr. Justice Porter concurs in this dissent.