No. 19,820.

J. W. SAYLOR et al., *Appellees*, v. EDWIN R. CROOKER et al. (THOMAS H. MURRAY and L. H. JACKSON, as Sheriff, etc., *Appellants*).

### SYLLABUS BY THE COURT.

1. ATTACHMENT LIEN—*Attaches Only to Existing Interest of Debtor.* Rule followed that an attaching or judgment creditor can not subject to the satisfaction of his claim or judgment any greater interest in property than that owned by the debtor.

2. SAME. Where a debtor holds only the naked legal title to property, and that title was vested in him only as a mortgagee, and the mortgage itself was unenforceable and void, an attaching or judgment creditor can not subject such property to the payment of the debts or judgment liabilities of the debtor.

3. ENDLESS CHAIN CONTRACT—*Patent Right Agency—Exchange for Deed —Rights of Attaching Creditors.* The plaintiff purchased from a patent holder of a crude oil burner an agency contract to sell "family rights" and "agency contracts." The agency contract was a characteristic scheme in the nature of "an endless chain," and void as against public policy. To secure the purchase price of the agency contract the plaintiff gave the patent holder a deed to some property, the deed being intended to operate as a mortgage. An attaching and judgment creditor of the patentee sought to subject the property to the satisfaction of his claim and judgment against the patent holder. *Held*, that the fact that the plaintiff, in the original contract, was in equal wrong with the patent holder will not prevent a court of equity from granting plaintiff relief when its refusal to do so would in effect give countenance, force and effect to the original illegal contract between the plaintiff and the patentee and carry its consequences even further than the contracting parties intended.

4. PRACTICE—*Wrong Reasons Given by Trial Court for Correct Decision.* —Where proper findings of fact based upon the evidence have been made, it is not ordinarily important what course of judicial reasoning is announced by the trial court in arriving at its decision when the decision itself is correct.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed April 8, 1916. Affirmed.

*C. E. Pile, E. L. Burton, L. E. Goodrich,* and *George F. Burton,* all of Parsons, for the appellants.

*W. S. Hyatt, Paul MacCaskill, C. E. Cooper,* and *John Madden,* all of Parsons, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs brought this action to restrain. the defendants from selling certain property claimed and occupied by plaintiffs but the title to which was in the name of Edwin R. Crooker, a judgment debtor of Thomas H. Murray. Plaintiffs alleged that the deed from them which had conveyed the property to Crooker was in reality a mortgage to secure the payment of J. W. Saylor's share of the purchase price of an agency contract for the sale of "family rights" and "agency contracts" pertaining to a patented crude oil burner owned by Crooker, and that the conditions of the mortgage obligation had been discharged and satisfied.

A demurrer to plaintiffs' petition was sustained by the district court and on appeal that judgment was reversed. (Saylor v. Crooker, 89 Kan. 51, 130 Pac. 689.) Thereupon the cause was remanded and tried by the court without a jury, and extended findings of fact and conclusions of law were made and a judgment for plaintiffs was rendered.

The defendants appeal, and the various errors assigned mainly turn on the question as to the duty of a court of equity when one who has deliberately engaged in an illegal enterprise seeks relief from its consequences.

There can be no doubt about the illegality of the contract between J. W. Saylor and Edwin R. Crooker. It was one of those characteristic "endless chain" swindles which appear occasionally in various parts of the country, designed to prey on the cupidity of the gullible. This is what the trial court said about it:

### FINDINGS OF FACT.

"*Twelfth:* The agency contract purchased by said Saylor and Tinder from Edwin R. Crooker, and those authorized to be sold by them, thereby, were and are what is known as 'endless chain contracts' by the terms of which said Crooker in each several contract, by whomsoever sold, was to receive one-half of the consideration paid by the purchaser for such contract. Saylor and Tinder were, by such contract and the power of attorney attached thereto and made a part thereof, made, constituted, and appointed the lawful attorneys of the Little Crater Crude Oil Burner Company, and thereby authorized and required to sell contracts identical with the one purchased by them, as well as 'Standard' and 'Special' contracts, and they were thereby authorized to sign the name of such company to

40—97 KAN.

all such contracts as they might find purchasers for, and they were limited as to place of sale, only within the limits of the United States, and were thereby authorized to execute powers of attorney to sell said agencies identical with their own, and they in turn to execute such powers of attorneys, and so on without end, so that each purchaser of a patentee agency contract was obligated to sell such contracts to others, anywhere within the limits of the United States, and delegating like powers and authority to such others, *ad infinitum.*

"*Thirteenth:* Saylor and Tinder having contracted to pay $5000.00 for their agency contract, by the terms thereof, they having to pay one-half of the amount received from the sale of their contracts, to said Crooker, would have to sell two similar contracts in order to get a return of their money thus invested, and the two to whom they sold would have to sell four of such contracts in order to get a return of their investment, the four would be compelled to find purchasers for eight thereof in order to make themselves whole in the transaction, and to get away from Crooker with ten separate groups of purchasers, the last group would have to sell 1024 agency contracts of a like kind to break even with their investment, in such a deal none of the purchasers would have made a cent in the transactions and Crooker would have thus stolen a sum equal to $5,080,000.00, and yet there would have been but 2046 of the hundred million people of the United States who had been duped, continue the deal but two groups further, or to twelve away from Crooker, and we would have 5118 who had been robbed, and Crooker will have reaped a harvest of $20,440,000.00 for all of which neither he nor any of said agents ever gave one cent's consideration; to pursue this a few groups further, and the figures would become so enormous that it would almost stagger one to contemplate it."

It is familiar law that where two parties to an illegal transaction are equally in the wrong, neither can ordinarily obtain relief from a court of equity. The court will simply leave them where they placed themselves. There are some qualifications upon that rule, however, although it may not be necessary to bring them to the fore in the instant case. Let us first apply this elementary rule here. Crooker's deed to Saylor's property is in fact a mortgage. The mortgage was given by Saylor in payment of the purchase price of an illegal agency contract. The Saylors are in possession. Here the ancient maxim naturally intrudes: "*In pari delicto melior est conditio possidentis*" (Where parties are equally at fault, the situation of the possessor is the better one). Crooker holds only an unenforceable mortgage on Saylor's property. Murray, an attaching creditor of Crooker, can neither attach, acquire nor subject to execution sale any greater interest in the Saylor property than

Crooker. An attaching creditor seizes only the existing interest of his debtor. No more. (*Hall v. Terra Cotta Co.*, ante, p. 103, 154 Pac. 210, and cases cited.) The fact that the record title was in Crooker takes nothing from the certainty of this proposition. (*Harrison & Willis v. Andrews*, 18 Kan. 535; *Holden v. Garrett*, 23 Kan. 98; 4 Cyc. 564; 17 Cyc. 967.)

Viewing this case from another angle, and again applying the elementary doctrine that the courts will not aid in carrying out an illegal transaction, it must be clear that if this attaching creditor of Crooker is permitted to seize and sell Saylor's property to satisfy Crooker's debt to Murray, there is in effect an active and positive judicial interference to aid in carrying out to its completion the illegal transaction between Saylor and Crooker, and to give Crooker the full benefit of that illegal contract.

Moreover, there is still another view, and one well sustained by the authorities. Equity does sometimes interfere to relieve one of two parties who are *in pari delicto*. It will do so if its forbearance would result in a still greater offense against public morals and good conscience. This doctrine is well illustrated in the case of *Hobbs v. Boatright*, 195 Mo. 693, 93 S. W. 934, 5 L. R. A., n. s., 906, where the plaintiff was permitted to recover $6000 which he had lost in a fake foot race, although he himself was a party to a conspiracy to defraud others. It was there said:

"The difficult question in the case is, upon which side of this controversy should the law of public policy be applied? Plaintiff schemed with men, as he supposed, to defraud others; his only disappointment was that the men with whom he thought he was scheming had readily schemed to defraud him, and they did fleece him to the sum of $6,000. If we should now say to the plaintiff, 'you cannot recover because, although you did not accomplish what you intended, yet your purpose was to assist those men to defraud others, and, therefore, you are as guilty as any of them,' we would, by so saying, allow the gang and their aiders and abetters to go free, retain the booty, and set their traps again. The doctrine that courts will not aid a plaintiff who is *in pari delicto* with the defendant is not a rule of universal application, it is based on the principle that to give the plaintiff relief in such case would contravene public morals and impair the good of society; therefore the rule should not be applied in a case in which to withhold the relief would, to a greater extent, offend public morals. To promote the good of the public is the highest aim of the courts in the application of this doctrine. Under the head of exceptions to the rule in 9 Cyc. 550, it is said: 'Although

the parties are *in pari delicto*, yet the court may interfere and grant relief at the suit of one of them where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with the defendant. But here the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom the relief is granted is simply the instrument by which the public is served.' A question of what is public policy in a given case is as broad as a question of what is fraud in a given case, and is addressed to the good common sense of the court." (p. 715.)

(See, also, the citations and the Note in the foregoing L. R. A. report.)

We would hardly say that the Saylor-Crooker contract was as vicious and immoral as the transaction in the Boatright case just cited. Its illegality is more analogous to that of the "Bohemian Oats" swindle which was perpetrated repeatedly over a wide section of the country thirty years ago. (*Shipley v. Reasoner*, 80 Iowa, 548, 45 N. W. 1077; *McNamara v. Gargett*, 68 Mich. 454, 36 N. W. 218; *George Shirey v. Isaac Ulsh*, 2 Ohio C. C. 401; *Richard Carter v. J. W. Lillie et al.*, 3 Ohio C. C. 364)

In all these cases, the parties seeking relief were denied it because to do so would give countenance to the illegal transactions. Here, however, unless equity interposes, the mortgage given as consideration for the illegal contract will be enforced—aye, more, it will be given all the potency of a valid and indefeasible conveyance, and the property will be subjected as legitimate assets of Crooker to the satisfaction of Crooker's debts. This would be carrying the illegal contract much further than Saylor and Crooker ever contemplated, and attaching consequences to it which it would not warrant if the transaction had been entirely free from legal infirmities. In such a situation, neither equity nor good conscience should hesitate to frustrate such result.

In the trial court's conclusions of law it was assumed that in our former decision directing that the demurrer to the petition be overruled we necessarily considered and determined that the Saylor-Crooker contract was "fair, valid and binding." Nothing to that effect was said in the opinion, and by resorting to the briefs in that case the writer finds that the question as to the legality of the contract was not discussed by counsel for either party. Indeed, the briefs gave not the slightest hint

McIntyre v. Surety Co.

as to the views of the trial court on the illegality of the Saylor-Crooker contract. (Vol. 7, Briefs 89 Kan. Files of State Library.) Very properly, then, this court's decision was confined to the propositions which counsel chose to present.

However that may be, by a very different course of reasoning the trial court arrived at a just and equitable result, and its judgment is substantially correct.

The judgment is affirmed.