No. 21,153.

THE STATE OF KANSAS, *Appellee*, v. ARCHIBALD C. SWEET, *Appellant.*

### SYLLABUS BY THE COURT.

1. HOMICIDE—*Plea in Abatement—Preliminary Exmination—Waiver.*
   A plea in abatement based upon allegations that a defendant charged
   with a felony had not been given a preliminary examination, and
   that his waiver of it was made involuntarily and in fear of mob
   violence, presents an issue of fact; and the determination thereof by
   the trial court upon sufficient though disputed and conflicting evi-
   dence is ordinarily conclusive on appeal.

2. SAME. A defendant charged with murder in one county was taken to
   the county jail of another county for safe-keeping. There was some
   danger of mob violence to defendant in the county where the crime
   was committed. The defendant while in jail in the other county, in
   perfect safety and without coercion, agreed to make a night journey
   into the county having jurisdiction, and agreed to waive his pre-
   liminary examination before a magistrate. The journey was made;
   the magistrate met the defendant and his escort on the prairie at
   midnight; the warrant was read to him; he knew what crime he was
   charged with; he formally waived his examination according to the
   prearranged plan and agreement; and the magistrate noted the fact
   of waiver in his docket. The defendant was then carried back to the
   jail to await his trial in the district court. *Held,* that the circum-
   stances show a voluntary waiver of defendant's right to a prelimi-
   nary examination, and that his plea in abatement was properly over-
   ruled.

3. SAME — *Motion for Continuance Denied — No Error.* In a prose-
   cution for a felony, it is not error to overrule a motion for a contin-
   uance based upon the absence of defendant's chief counsel, when the
   trial court is satisfied that the junior counsel hurriedly called into the
   case are experienced lawyers and thoroughly competent to conduct
   the defense and to protect the rights of the accused.

4. SAME—*Changing Place of Trial.* Where the record is silent as to
   the reasons for changing the place of trial from the county court-
   house to the county-seat high-school auditorium, and the record is
   silent as to any objection of defendant thereto, and no prejudice to
   defendant's rights is disclosed, the change in the place of trial is
   nonprejudicial.

5. SAME—*Separation of Witnesses—Judicial Discretion.* In a felony
   case, a request for the separation of witnesses is seldom denied if
   timely made; but the granting or refusal of such request is so largely
   a matter for the sound discretion of the trial court that error can

The State v. Sweet.

not be based thereon unless that discretion is plainly abused; and *held*, in the instant case, no abuse of discretion is disclosed:

6. SAME—*Evidence.* Various errors in the exclusion of evidence examined and held to be without merit.

7. SAME — *Evidence.* Various errors in the admission of alleged incompetent evidence examined and not sustained.

8. SAME—*Evidence of Bloodhounds—Properly Admitted.* The "bloodhound" evidence in this case conformed to the prerequisites and limitations in the use of such evidence as defined in *The State v. Adams,* 85 Kan. 435, 116 Pac. 608.

9. SAME—*Instructions.* The instructions to the jury given and refused examined and no error discerned therein.

10. SAME—*Trial—No Prejudicial Error in Record.* Some of the many facts and circumstances upon which the state relied for a conviction on a charge of murder examined, and *held* that the evidence was sufficient to require its submission to a jury and to sustain the verdict of the jury.

Appeal from Hamilton district court; GEORGE J. DOWNER, judge. Opinion filed November 10, 1917.. Affirmed.

*J. I. Sheppard, James G. Sheppard,* both of Fort Scott, *Donald Muir,* of Anthony, *L. A. Madison,* of Dodge City, and *Ernest D. Martin,* of Kansas City, Mo., for the appellant.

*S. M. Brewster,* attorney-general, and *H. W. Stubbs,* county attorney, for the appellee; *George Getty,* of Syracuse, of counsel.

The opinion of the court was delivered by

DAWSON, J.: This defendant, Archibald C. Sweet, was convicted of murder in the first degree for having brought about the death of Nellie J. Byers, a rural-school teacher of Grant county. While this unfortunate young woman was returning from her school to her boarding house on the afternoon of October 22, 1915, she was assaulted on the open prairie, stripped and strangled, ravished and slain.

Sweet was charged with the crime, and arrested and taken to the Dodge City jail for safe-keeping. After some weeks he was taken by night into the jurisdiction of Grant county to waive his preliminary examination, and then carried back to Dodge City. His counsel procured a change of venue, and he was tried and convicted in Hamilton county.

The principal errors urged here in his behalf are: (1) Overruling his plea in abatement; (2) overruling his application for a continuance; (3) transferring the place of trial from the county courthouse to the county-seat high-school auditorium; (4) denying his request that the witnesses be excluded from the court room; (5) the exclusion of competent evidence; (6) the admission of incompetent evidence; (7) erroneous instructions given and refused, and (8) that the verdict was not supported by the evidence.

(1) Considering these in order, the plea in abatement was based upon defendant's contention that he had not voluntarily waived his statutory right to a preliminary examination before an examining magistrate. (Crim. Code, § 69.) His plea alleged the facts of his arrest on October 23, 1915, and of his incarceration at Dodge City on October 24; that on November 22 the sheriff, deputy sheriff and county attorney of Grant county came to the jail at Dodge City, in Ford county (about seventy-five miles from Grant county), and that these officers informed defendant that the people of Grant county were threatening his life and that he would be in danger of personal violence if he were taken back to Grant county for a preliminary examination, and that the county attorney said he "would hate like hell for three or four or more men to get shot up just for one man."

"We will take you out on the prairie at night, when there is no one around, and have you waive preliminary, because that is the only thing you can do to save your life; otherwise these people will kill you sure; besides there is no necessity to have a preliminary as the justice will bind you over anyway."

The plea in abatement continues:

"That with these and other arguments and persuasions upon the part of the Grant county officials, as aforesaid, said defendant was induced to accompany them on the train to Garden City, Kan., thence in an automobile across the country until they arrived within the edge of Lincoln township, Grant county, Kansas; the jurisdiction, as supposed, of said Justice Davis, as aforesaid, and there out upon the bleak, bare, windswept prairie at the dead hour of night, or after the hour of midnight of said date, and by the lights of the automobile, he was informed by said officials of Grant county, as aforesaid, including Justice S. A. Davis, justice of the peace as aforesaid, that Justice S. A. Davis, whom they met out on the prairie after more than one o'clock at night, informed defendant that there were three cars loaded with men out looking for you, and that

there was nothing else for defendant to do but to waive preliminary, and do it quick, in order to save his life, and then go back to Dodge City as quick as possible; said justice further ordered that the lights of the automobile be put out because of the fear that some of the men would be out there looking for Sweet, and seeing the lights would come and take him and lynch him; that it would be impossible to have any preliminary for the reason that the people were angry, aroused as well as armed, and would surely kill him; that he should withdraw all objections to waiving his preliminary examination and promptly waive it, as this was his only recourse to save his life.

"Defendant being thus overpersuaded by the officials of Grant county, as aforesaid, and being in fear of his life and safety and being in mortal fear of mob violence as aforesaid, and being prevented the aid of friends and the advice of counsel, as well as relying upon the statements and representations of said Grant county officials, as aforesaid, believing them to be true, and having confidence that they would not mislead him, and in the sole hope of saving his life, he thereupon acceded to their demands and answered 'yes' to the question as to whether he wished to waive his preliminary.

"That immediately after he answered 'yes' to said question, said proceedings, which did not occupy but a very few minutes, the automobile was driven back to Garden City, Kan., as aforesaid, and from thence defendant was returned to Dodge City, Kan., where he has remained in the county jail to this date."

The state joined issue on this plea. Evidence was introduced on both sides. On cross-examination the defendant admitted that he "always wanted to be kept out of that [Grant] county until the guilty man was caught." The state's evidence tended to show that the extraordinary care taken of the defendant's person by the Grant county officials was at his own request. When he learned that bloodhounds were to be employed to track the murderer, he spoke to the county attorney: "Mr. Stubbs, if they bring those dogs down here, I want protection." The state's evidence also tended to show that when the county officers came to Dodge City to take him back to Grant county for his preliminary examination, he told them he was willing to waive it.

On cross-examination by counsel for defendant the county attorney testified:

"Q. Did Mr. Sweet ever suggest to you that he wanted to waive his preliminary examination? A. He did; yes, sir.

"Q. From whom did the suggestion first come, that he waive his preliminary examination? A. I believe I paved the way for it, but he asked first and suggested it.

"Q. You talked the matter over? A. Yes, sir; shortly before this evening on which we took him out, we talked together about it.

"Q. How did you pave the way, as you call it? A. Well, I just asked him if he wanted to demand his preliminary, or if he would like to waive it.

"Q. What did he say to that? A. He said he would just about as soon waive it.

"Q. Did he say anything else? A. Well, he finally said he would waive it, in fact, that he wanted to waive it.

"Q. Now, after you got out to the edge of Grant county, to where this waiver took place, what, if anything, did Mr. Sweet say about waiving it, on account of the fear that he had of mob violence? A. He made no mention of that whatever.

"Q. Was the question of mob violence, or his fear of mob violence, discussed at the time, or about the time of the waiver, while you were out there in Grant county, and at the place where the justice of the peace met you? A. It was not."

On redirect examination he testified:

"Q. Was there any conversation between Mr. Sweet and anybody else out there about mob violence? A. There was not, except as I have already related it."

The undersheriff testified:

"Q. Did he at that time request a preliminary hearing? A. He did not. He always insisted that he wanted to waive it.

"Q. Have you seen him at any time since then, and prior to the last day or two? A. I seen him on the tenth day of January of this year.

"Q. Was the matter of a preliminary hearing mentioned at that time? A. No, sir."

It will thus be seen that notwithstanding the defendant's evidence which tended to support his plea in abatement and tended to show that his waiver of a preliminary examination was constrained and not voluntary, the state's evidence was to the contrary. It tended to show that it was voluntarily agreed to by defendant before he left the Dodge City jail, and it tended to show that his journey into the jurisdiction of Grant county at night was not to have a preliminary examination but merely to go through the formality of waiving it before a Grant county magistrate. The state's evidence tended to show that the formality of waiving the preliminary examination was carried out just as defendant voluntarily intended before leaving Dodge City. The issue under this plea in abatement and the evidence pro and con concerning it raised a question of fact for the trial court's determination; and the matter

falls within the ordinary rule that a trial court's decision or finding of fact, when supported by substantial though conflicting testimony, can not be disturbed on appeal. The trial court overruled the plea in abatement, finding that "in this case the evidence shows that the defendant has had a preliminary examination, or rather that he has waived it."

In *The State v. Bohan,* 19 Kan. 28, it was said:

"Where the trial court has had the opportunity of hearing the testimony from the witnesses in person, and of seeing them as they uttered the same, and has thereon rendered a decision, this court will not hold such decision erroneous as to questions of fact, unless it is *clearly* apparent that the decision or finding is wholly unsupported by evidence." (p. 56.)

(*The State v. Plum,* 49 Kan. 679, syl. ¶ 2, 31 Pac. 308; *The State v. Hetrick,* 84 Kan. 157, 161, 113 Pac. 383. See, also, *The State v. Bailey,* 32 Kan. 83, 3 Pac. 769; *The State v. Myers,* 54 Kan. 206, 213, 38 Pac. 296; *The State v. Kornstett,* 62 Kan. 221, 224, 61 Pac. 805.)

The cases of *In re Malison, Petitioner,* 36 Kan. 725, 14 Pac. 144, and *The State v. Goetz,* 65 Kan. 125, 69 Pac. 187, are urged on our attention by counsel for defendant but they are not in point. The Malison case was an original proceeding in this court and consequently this court had to perform the functions of a trial court, and it found the controlling fact to be that the petitioners had waived their preliminary examination through fear of personal violence and not voluntarily. In the Goetz case, *supra,* there had been no preliminary examination of defendants and no semblance of waiver.

No error is disclosed in overruling defendant's plea in abatement.

(2) On application of counsel for defendant a change of venue had been granted, and the cause was set down for hearing at Syracuse on May 22, 1916. Prior to that time the only attorney engaged on behalf of the defense was J. I. Sheppard, esquire, of Fort Scott. As the date for the trial drew nigh, it developed that Mr. Sheppard was in the midst of an important lawsuit in Kansas City and could not reach Syracuse in time for the commencement of the trial of defendant. He therefore engaged other counsel to serve in his stead. After the plea in abatement was overruled, these lawyers so lately

called into the case filed a motion for a continuance on account
of Mr. Sheppard's absence and their own unfamiliarity with
the case.  The trial court denied the motion, giving various
good reasons therefor; one being—

"I appreciate the situation Mr. Muir is in,  . . .  the fact Mr.
Sheppard can not be here at this time is very unfortunate, but I want
to compliment Mr. Sheppard on one thing—I have had an opportunity
to observe you gentlemen for two days now, and I think Mr. Sheppard
made no mistake in his assistants who are to represent Mr. Sweet when
he selected Senator Martin and Mr. Muir, and I am confident that you
gentlemen will be able to defend Mr. Sweet,  . . .  after having ob-
served you gentlemen for twenty-four hours, and the way you have
conducted this case up to the present time, I am fully confident his
rights will not be injured or prejudiced in the slightest, and that he will
be well and ably defended during this trial."

It is familiar law that a motion for a continuance is ad-
dressed to the sound discretion of the trial court. (*Davis v.
Wilson*, 11 Kan. 74, syl. ¶ 3; *Gurney v. Steffens*, 56 Kan. 295,
297, 43 Pac. 241.)  Here there was no abuse of that discre-
tion; and the zeal, industry, resourcefulness and talents dis-
played by the lawyers chosen by Mr. Sheppard until he him-
self could take charge of the defense is the best of proof that
defendant suffered no prejudice through the refusal of a con-
tinuance.  (9 Cyc. 166, 171.)

(3) After the plea in abatement and motion for a continu-
ance were overruled, and after the jury were impaneled and
sworn and taken under charge of the bailiff to view the scene
of the crime and the surrounding locality (a distance of fifty or
sixty miles from the place of trial), on the return of the jury
the place of trial was transferred from the county courthouse
to the Syracuse (county seat) high-school auditorium.  Why
this was done the record does not explain.  Defendant says it
was over his objection, and he refers us to the record, but the
record is silent.  The state says it was done without objection.
We are, therefore, bound to assume that there was some good
reason therefor and that the defendant did not object; and,
moreover, no prejudice to his rights is disclosed.  (Crim. Code,
§ 293.)

(4) Defendant's request that the witnesses be excluded from
the court room was denied.  This request was made after the
state's first witness had given his testimony.

[The attorney-general]: "Why, that request is made too late now. If they had desired that rule invoked, the request should have been made at the commencement of the trial.

"By the court: I rather think so, too. I think I will have to deny the request at this time."

A request for the separation or exclusion of witnesses in a murder trial, if timely made, is seldom denied; but the matter rests almost wholly within the sound judicial discretion of the trial court. (*The State v. Davis*, 48 Kan. 1, 9, 28 Pac. 701; 38 Cyc. 1369, 1370.) Here there is nothing to indicate that the trial court abused its discretion, whether its ruling be tested on the reason given for it or on the broader ground that even if the request was not too late it might have been denied with entire judicial propriety. (*Saylor v. Crooker*, 97 Kan. 624, syl. ¶ 4, 156 Pac. 737.)

(5) Noticing the errors urged on the exclusion of evidence —so far as they merit attention—the defendant was not permitted to answer the question:

"Q. Did you rely on the statements they [the county officials and the justice of the peace] made to you?"

The answer sought was a mere self-serving and repetitive avowal of matters already sworn to by the witness.

The defendant sought by cross-examination of the deputy sheriff to develop the fact that the justice of the peace who received defendant's waiver of examination had filed no bond since his last election. The state's objection was sustained. Besides the obvious objection that such was not the best evidence, it was no more proper to inquire collaterally into the legal qualifications of the justice than it would have been to call for a scrutiny of the trial judge's certificate of election. Sometimes assiduous counsel overdo their part. When they press many minor quibbles in a court of appeal it gives the reviewing court much needless and burdensome anxiety lest something really grave and meritorious be overlooked in the wilderness of trivialities.

Counsel for defendant, by cross-examination of the state's witnesses, endeavored to inject something into the record about some "Bill Smith," who was in the neighborhood the afternoon the murder occurred, and whether or not such a man appeared later elsewhere with scratches on his face and

a black eye. No error transpired in its exclusion, since it was not proper cross-examination.

Doctor Brownell, a witness for the state, who had examined the body of Miss Byers and had testified as to the indications that she or her dead body had been subjected to ravishment, was cross-examined:

"Q. Did you ever state that this had been sent to the State University for analysis, and the report came back that it could not have been male emission?

"To which question plaintiff objects, as question should be more definite, stating to whom the statement was made, and the time and place.

"Objection sustained by the court.

.  "Q. I will ask you, doctor, if in the presence of George Shadle and of Mr. Woodside, at Moscow, you stated that this substance had been sent to the State University for analysis, and that the report had come back that it could not have been the male emission?

"To which question plaintiff objects as incompetent, irrelevant and immaterial, for the reason that he has testified that he did not send this away, or know anything about it being sent away.

"Objection sustained by the court."

The reasons for the rulings are sufficiently given in the state's objection to this line of examination.

Some ill-defined objection is made in defendant's brief to the evidence of a chemist and analyst from the state university:

"Finally, the dangerous flounderings of this 'expert' was the magic which 'smoked out' the long-sought 'report,' the 'first report,' 'his report,' which was finally discovered to be 'a report' made by Prof. L. E. Sayre, instead of being the result of the wonderful mentality of this would-be expert, drawing $5 per, together with expenses and mileage, who, after denying three different times, finally admitted that he made this second examination on 'his own account.' "

The point to this is shrouded in a cloud of words. Rhetorical effervescence, of which there is a great deal in appellant's briefs, serves no purpose on appeal.

Nothing further touching the evidence excluded calls for comment.

(6)  Touching the errors based on the admission of incompetent evidence, no error can be discerned in the introduction of the bottle containing the epithelial cells and mucous membrane of the victim, nor in submitting to the jury a kodak pic-

The State v. Sweet.

ture of the victim's dead body, nor in the evidence of the chemist and analyst, nor in the evidence of the doctor who examined the body. All such matters go in merely for what they may be worth in the general total. (*Cook v. Railway and Bridge Co.*, ante, p. 103, syl. ¶ 6, 165 Pac. 803.)

A witness testified that as Miss Byers was accustomed to pass on her way to or from school the defendant had repeatedly and in the coarsest language expressed a desire to gratify his lust on the school teacher, and that he would do so "if he ever got the chance."

"To which previous question and answer the defendant objects as incompetent, immaterial and irrelevant, and as an attack upon the character of the defendant.

"By the court: What is the purpose of this testimony?

"[The attorney-general] : I think the statements he may have made with reference to sexual matters, directly connected with Nellie Byers, shows the state of mind that he was in and the way he was thinking about her. The charge in this case is murder committed in the perpetration of a rape, and if we can show that the defendant expressed desires to have intercourse with this girl, and made derogatory remarks about her, I think it tends to show that he was thinking about those things, and his state of mind.

"Objection overruled by the court."

The case of *The State v. Boyland,* 24 Kan. 186, is cited as disapproving this evidence. Not so. In that case the shameful words and acts were spoken and committed after the crime. Here they were spoken before the crime and had some probative value to show that defendant was contemplating criminal violence against the girl.

Complaint is made of the court's refusal to strike out part of the evidence of the Dodge City jailer, who testified about a conversation which he had held with the defendant while the latter was in jail in Dodge City. The court said: "I will reserve my ruling for the present on your motion." The court has examined this evidence. It recounted defendant's admission of a disgusting incident of slight, very slight, probative value. But the court should have ruled on the motion one way or the other. In this particular instance it would not have been important which way the motion was decided; but it is seldom good trial practice, especially in a murder case, to reserve a ruling on the admissibility of evidence. When the questioned evidence goes in the jurymen at once begin to interweave it

with the fabric of facts being formed in their minds. A trained judge or lawyer or a trained and discriminating thinker can disassociate irrelevant and incompetent facts from his thinking processes by the slightest effort of his will. He can do so almost unconsciously. But we all know that the average layman—the average juror—can not do so. It is therefore important that a trial court's rulings on the admissibility of evidence should be made promptly, even at the risk of an occasional mistake. And where a ruling on evidence is reserved, and when the judge later decides that it is incompetent, he should be sure that the jury fully understands the effect of his ruling—that the facts or matter objected to must not be considered by them in their determination of the facts. But here the court holds that the evidence objected to was competent, and that the defendant was not prejudiced by the court's reservation of its ruling on it nor by the court's omission to rule on it later.

Objections to the use of "bloodhound evidence" were made, but the "bloodhound" evidence introduced conformed to the prerequisites and limitations in the use of such evidence as laid down in *The State v. Adams*, 85 Kan. 435, 116 Pac. 608; *The State v. Mooney*, 93 Kan. 353, 354, 144 Pac. 228. It is of no consequence that some other courts do not countenance such evidence. The question is settled in this jurisdiction.

(7) The instructions given and refused are too lengthy for repetition here. They have been examined. Those given were proper, comprehensive, and sufficient. They covered everything which was proper to be covered in those prepared by defendant's counsel.

(8) Was the verdict supported by the evidence? The record is long. The transcript contains 1,428 pages. Appellant's first abstract contains 333 pages, his second abstract 146 pages; the state's counter-abstract has 122 pages. We have had a brief by appellant, a brief by the state, another brief by appellant, a brief by the state touching misstatements contained in appellant's abstract and brief, and a reply brief of appellant touching misstatements in the state's final brief. To set out all the facts and circumstances by which the state sought to fasten this revolting crime upon Archibald C. Sweet would merely be to reproduce the transcript. And it would serve no

useful purpose. The state's evidence tended to show that on the day of the murder the defendant was staying alone in a "dugout" belonging to a family which had been away from home for some days. This "dugout" was near the scene of the crime, out on the open prairie of that sparsely settled portion of the state. Prior thereto, but not too remote to be of probative value, Sweet had repeatedly expressed a lustful passion for Miss Byers, and had declared his criminal purpose to gratify it if he got a chance. Sweet admitted that he saw the girl as she came homeward from her school on the fateful afternoon. Miss Byers usually drove to and from school with a horse and a buggy, accompanied by children. That afternoon she was on foot and alone. Sweet was out hunting. He admitted that when he saw her, if he had kept on in the direction he was then going and if she had kept on in the direction she was then going, they would have met near the spot where she was murdered. He told a newspaper man that he was some three hundred yards away when the girl was assaulted, and that he could probably have seen the murder perpetrated if he had looked over his left shoulder. This, of course, defendant denied at the trial. While others far away over the prairie heard the screams of a woman in distress, he who was much closer professed to have heard nothing. On the witness stand he said that the day following the murder an acquaintance said to him, "I am the fellow that done that, but it looks damned bad for you." Although he knew that he was then under suspicion of the crime, he did not give the public officers any information of this pretended confession of his acquaintance. This story had every earmark of a lie, and doubtless the cross-examination of the defendant on this incident shook the jury's faith in his protestations of innocence. The fact that he felt that he was under suspicion while the officers and his neighbors were investigating the crime, on the day after the murder, was significant. When mention of bloodhounds coming to take up the murderer's trail was made, he said, "If they bring those dogs here, I want protection." The girl's body indicated that she had been raped at or about the time of her strangulation. Sweet told the Dodge City jailer that the night of the murder he dreamed that he had had sexual intercourse with a woman. Some other coarse details of this evidence need not be here repeated.

They were slightly probative. The bloodhounds readily took up Sweet's trail and followed it to the bed in the "dugout" where he had slept. The hounds took his trail up again and followed it to a spot where Sweet had been taken into the officers' automobile. Sweet was asked by the acting coroner when he had taken a bath. He replied that he did n't know when, some considerable time before. Yet, although he was, living in a "dugout" and working at ordinary rural labor, and hunting in the dirt and dust of that frontier community, when he stripped for the officers' inspection he was thoroughly clean. So were his underwear and socks. At the trial Sweet testified that he had taken a bath on the day of the murder and also on the day before. Many incidents like these made up the state's case against Sweet. It was undoubtedly a case for submission to the jury. We are not unmindful of the strenuous efforts made by defendant's counsel to cast suspicion on other persons as the possible perpetrators of the crime. They displayed much cleverness in that regard. We note also the incident of the teeth marks on Miss Byers' breast which defendant's expert witness swore so stoutly could not be the teeth marks of Sweet, but of another person who at one time had been suspected of the crime. We do not fail to notice also that Sweet was not scratched or marked as might be expected in a physical struggle with a woman fighting for her honor and her life. There was a slungshot in the "dugout." There was a blow on the back of the girl's head as if made by a slung-shot. Probably the poor victim was stunned by the blow and never had a chance to fight. There was evidence, somewhat unsatisfactory and discredited through skillful cross-examination perhaps, that the footprints of the murderer corresponded with those of Sweet or of the shoes he was wearing. But all these matters were for the jury; they were the triers of the facts. The facts adduced warranted and required the court to submit the case to the jury for its determination, and their verdict may not be disturbed. (*The State v. Mullins*, 95 Kan. 280, 304, 147 Pac. 828.)

There is no prejudicial error in the record. Archibald C. Sweet had a fair trial. He was ably and zealously defended. The jury upon competent and sufficient evidence found him guilty. The trial court approved the verdict; and the judgment is therefore affirmed.