## STATE OF KANSAS

### JANUARY TERM, 1925.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. JOHN MARSHALL,
Hon. JOHN T. DAWSON, } Justices.
Hon. W. W. HARVEY,
Hon. RICHARD J. HOPKINS,

No 25,174. .

THE STATE OF KANSAS, *Appellee,* v. EMMETT FIXLEY, *Appellant.*

#### SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Bloodhound Evidence—Competency.* Testimony of the trailing of bloodhounds of one charged with crime may be used in evidence in corroboration of other evidence or as a circumstance tending to show the presence of the accused at the location of the crime, where it is shown by one having knowledge that the dogs were trained and tested in tracking human beings and by previous experiences had been found to be accurate and reliable.

2. SAME—*Weight and Sufficiency.* Testimony of this kind without other substantial evidence connecting the defendant with the crime charged is insufficient to sustain a conviction, and it is held that the evidence in the present case does not support the verdict of the jury finding the defendant to be guilty.

Appeal from Miami district court; JABEZ O. RANKIN, judge. Opinion filed March 7, 1925. Reversed.

*Silas Porter,* of Topeka, *Alpheus Lane,* and *Karl V. Shawver,* both of Paola, for the appellant.

*C. B. Griffith,* attorney-general, and *S. J. Shively,* county attorney, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: Emmett Fixley was charged with and convicted of the murder of Flora Ready, and from the judgment of conviction he appeals.

At the time of the offense Flora Ready was about forty-five years of age, had a daughter seven years old and was living with her mother in Osawatomie. She was employed in a telephone exchange and on the evening of February 18, 1923, was receiving and answering calls until about 9:30, when she was relieved by another operator and started for her home, which was about four blocks from the telephone exchange. She was accompanied by another operator about half the distance and then proceeded homewards alone. She was seen at the corner of the railroad station, where she turned south going across a parking near the station. She was not seen alive again by any of the witnesses. Not arriving home at the accustomed time, notice of her absence was given and a search for her was started. In the course of the search three persons with a lantern went to the railroad parking and there found a pocketbook, a pair of eyeglasses, a switch of hair, and some blood was found on the grass. Near these a pair of men's gloves was found. Continuing the search the body was found about 175 feet away in a dark place near an icehouse. Her upper lip was cut through, her face was bruised and bloody, one eye was black and swollen, and she had evidently been struck a heavy blow on the jaw. A scarf which she had worn was twisted and drawn tightly around her neck. The shoes worn indicated that the body had been dragged from the place of attack across the railroad tracks to the icehouse. There she was found about 10:35, lying upon her back, her feet widely apart, her clothes above her knees, and there were some blood spots on her underclothes below the waist, and the coroner upon an examination reached the opinion that there had been recent sexual intercourse.

While there was a Negro resort or restaurant, said to be of low grade, close to the ice house, where the body was found, and a number of strangers in town who came there on account of a railroad strike, no clue led to suspicion that any of these had committed the assault, but attention was directed towards the defendant through the action of bloodhounds that were brought from Kansas City to the scene of the crime. The owner of the dogs arrived in Osawatomie about five o'clock the following morning. He was taken

to the park where the pocketbook, glasses, gloves and hair were found, and the dogs were started on a trail. They ran in circles for a time and then scouted up and down streets and alleys over vacant lots upon the porches of a number of homes and then came back to the locality from which they started. Two other starts were made, and on one of these the dogs went to the icehouse where Mrs. Ready's body was discovered, and from there pursued an irregular course, but in their ramifications they went to the house where the defendant was staying, which was his father's home, and later to a garage where he had been the previous evening. They also went to an automobile at the garage in which he rode to the railroad station. The door of the automobile was opened and one of the dogs went in and sat down on the back seat, which it is said had been occupied by the defendant on his trip to the railway station. Only one of the dogs entered the car, and there the owner who had them in leash appeared to think the quest was ended and did not start the dogs on another trail. The dogs had been traveling rapidly for a period of about two hours.

The action of the dogs is practically the only evidence upon which the conviction of the defendant is based. He was in the city when the offense was committed and left there for Kansas City about thirty minutes after it was committed. At first the prosecution seemed to place some reliance upon what was called the flight of the defendant, but it appears without dispute that he had arranged to go to Kansas City on an afternoon train of that day, but before the train left a relative came to town on another train and he postponed his trip to Kansas City to visit with the relative until he left later in the afternoon. There was no train leaving Osawatomie for Kansas City on that evening, and defendant consulted agents and taxi drivers as to where he could go to catch a train that would take him to Kansas City. He also used the public telephones for that purpose, and finally learned that by driving to Beagle, six or seven miles away, he could catch an M. K. & T. train that would carry him to his destination. It appears that he called at the White Way garage about 8:30 in the evening and arranged for a taxi to take him to the station, and left there saying he would return in about an hour. He did return about 9:45 or 9:50 and played two games of checkers while waiting for the taxi to take him to the station. Many people knew of the contemplated trip and of the circumstances of his leaving, and there is no ground to regard his

leaving as a flight from the scene of crime such as would give rise to an inference of guilt.

The defendant had been arrested a number of times and convicted of several offenses. These facts were brought out on his cross-examination and while competent as tending to impeach his credibility as a witness, they did not constitute evidence upon which to base a finding of guilt of the murder charged.

The defendant insists that the evidence relating to the action of the bloodhounds was not admissible because the dogs were not shown to have been sufficiently trained and skilled in taking the scent of human beings and tracking their footsteps, and that the former experiences of the dogs on human trails were not shown to be reliable. It is further contended that the action of the dogs after being set on the trail as they wandered about the city over streets and places not claimed to have been traveled by the defendant discredits any claim of their skill and reliability and deprives the evidence of any probative value. It is further contended that even if the action of the dogs be treated as admissible, as circumstances tending to show that defendant had traveled over some of the courses taken by the dogs, such evidence unsupported by other evidence connecting the defendant with the murder is insufficient to support a conviction. The owner of the dogs testified as to their training and experience saying that he was a bloodhound breeder, had had experience with dogs in trailing human footsteps, that he had owned one of the dogs since 1915, the other two were young dogs, one eight months old and another six months old. He stated that he had had experience with these dogs in trailing human footsteps and that they were reliable and accurate in their work. No instances of such experiences were given. The extent of his testimony as to the training, experience and skill of the dogs in tracking human beings, were his conclusions that the dogs were well bred and were reliable in their work. Each of the three dogs wore a harness to which a strap about eight feet long was attached and the owner took the dogs to the place in the park where the assault was committed, holding their heads from the ground until they reached the place pointed out to him as the location of the assault, whereupon he let their heads down with the admonition "go find them." They immediately put their noses to the ground picking up a scent and started on a trail. He stated that he did not jerk the dogs nor attempt to guide them to any particular place and

did nothing except to follow them and to keep repeating "go find them." There is a paucity of evidence as to the training of the dogs and as to the instincts, habits and faculties as shown by what they had previously done in following human trails, but as the conclusions of the owner were given without objection, and accepting them, it may be said there was some proof that the older dog at least had been trained and tested. In the course of the owner's testimony he stated that he placed most reliance on the youngest, the one that was six months old. The value of evidence in locating a suspect of crime by bloodhounds is still a debatable question and while accepted in many jurisdictions is used with much caution and is generally received as cumulative or corroborative of other evidence pointing to the guilt of the one charged with the offense. In *The State v. Adams*, 85 Kan. 435, 116 Pac. 608, where there was direct evidence of the guilt of the defendant, a part of which was an admission, it was decided that trailings made by bloodhounds may be received where a proper foundation is laid to the effect that the dogs by training and experience are shown to be accurate and reliable in following human footsteps. There the evidence was admitted as corroborative of other evidence tending to show that the defendant was guilty, but it was not held that a conviction could rest on bloodhound evidence alone. After stating what preliminary proof of the expertness of the dogs was essential to the admission of the evidence it was remarked:

"When all this is established, we then have this conduct from which to draw the inference that the defendant was at the place in question, a lesson in location taught by the exercise of canine instinct. It can be no proof of guilt, only some evidence that the party charged was at the place where the crime was committed, and hence where he could have committed it." (p. 440.)

It will be noted that the dogs when started at the place of assault did not follow the trail on which the criminal dragged the body of his victim over the railroad tracks to the ice house, which was only about 175 feet away. Instead they went up the railroad track, passed the ice house going north in an irregular course about half a mile, smelling as they went, and apparently following a trail, but up near the river bridge they acted as if they were lost, when they turned around and retraced their course about a block, then went east two blocks, then turned south going about half a mile southward, then west through an alley passing near the starting place, but going on west pursuing a devious course which brought them near the starting place and after which they went to the ice house

where the body was found. In their trailing they left the streets and went up to and smelled about a number of houses as if following a trail, but they did not stop long at any of them and the owner says they always stop at a place where the trail ends. There was no attempt to show that the defendant had been over or upon the long course the dogs had taken in this circuit of the town, nor that he had been at any of the houses at which the dogs called. After another start the dogs did go to the home of defendant's father and the older dog is said to have scratched on the door and whined. The door of the house was opened and the dogs entered, went upstairs through several of the rooms and then came down and went out at a door other than the one they entered. They went to the ice house and were given another start going in several directions past the bank and the city hall to the garage that has been mentioned. The persons in the garage were aroused and asked to open the door. A number of automobiles were in the garage and those escorting the dogs threw open the doors of five or six cars and the dogs smelled about, finally went to one of the cars and, as stated, one of the dogs jumped into the car and sat down on the hind seat. This was the car in which the defendant had been taken to the station. The point at which the defendant entered the car the previous night was not shown. He had been at the garage twice the previous evening, once when he arranged for the ride to the station and later when he stayed fifteen or twenty minutes at the garage waiting for the taxi to start to the station. The start to the station was made about 10:05 p. m. and the taxi went first to the defendant's home and stayed only long enough for him to get his grip and from there went directly to the station at Beagle. Aside from the fact that the dogs made a circuit of the town before they found the place where the body was found, the evidence was rendered still more weak and uncertain by the fact that many people passed over the places where the assault had been committed and also where the body was found. No effort appears to have been made to keep people away from these important places. At these places there were the footsteps of dozens of people and that may account in some measure for the devious tracking of the dogs. When the owner was asked the effect of numerous tracks he stated the obvious fact that no one could tell the scent which the dogs would pick up and follow. It was about seven hours after the murder before the dogs were set on the trail and one witness stated that when the body was found people began to collect there and that "within

fifteen minutes, I expect there were between fifteen and twenty people there. They were all excited and traveled back and forth."

Assuming that the evidence was admissible for what it was worth the question arises, What is its effect, is it sufficient to support a verdict of guilty? There is considerable authority on the admissibility and effect of this class of evidence and most of the courts treat such evidence as competent where there is proper preliminary proof of the quality and experience of the dogs. The authorities are grouped and reviewed in the following notes: 42 L. R. A. 432; 35 L. R. A., n. s., 870; L. R. A., 1917 E, 726; 1 Wigmore on Evidence, 2d ed., § 177. The greater number of the cases are in line with our holdings in *The State v. Adams,* supra; *The State v. Mooney,* 93 Kan. 353, 144 Pac. 228; *The State v. Sweet,* 101 Kan. 746, 168 Pac. 1112; and *The State v. Evans,* 115 Kan. 538, 224 Pac. 492. A number of the cases had to deal with the effect and value of such testimony. In *Meyers v. Commonwealth,* 194 Ky. 523, after deciding that the action of dogs of a breed characterized by acuteness of scent and power of discrimination, dogs which have been trained and tested in tracking human beings, and this preliminary proof is satisfactorily shown by one having knowledge of the facts, the evidence may go to the jury for what it is worth as one of the circumstances in connecting the defendant with the crime, but that when these requirements are not met the evidence should be excluded altogether. As to the value of the testimony the court said:

"Following the holding of the great numerical preponderance of the cases, which also conform to our conception of the correct rule, we have concluded to adopt the view that proof of trailing by bloodhounds standing alone is insufficient to authorize a conviction, for, after all, the trailing of the dogs is in the nature of expert testimony, which when given by trained and educated persons, is regarded with more or less disfavor and classed as among the weakest character of testimony." (p. 529.)

In the syllabus the court stated its conclusion in these words:

"The trailing of bloodhounds when brought within the above rules entitling it to be received is admitted, either in corroboration of other testimony tending to establish guilt, or is competent to establish an additional circumstance tending to show guilt, but in either event it is insufficient standing alone and in and of itself to authorize a conviction." (Syl. ¶ 3.)

In *Carter v. State,* 106 Miss. 507, where there was no evidence to connect the defendant with the crime except the circumstance of the dogs trailing to him from the place of a burglary, it was remarked:

"Shall a person, charged with crime, be convicted upon the fact, alone and unsupported, that trained bloodhounds trailed from the scene of the crime to him? It has been held that evidence of the location of a criminal by bloodhounds, after proving sufficiently the character, training, and experience of the animals, so as to show that they were accurate, certain, and reliable in following the trail of human footsteps, is admissible. Following this rule, the admission of this class of evidence will be further governed by the conditions and circumstances of each particular case. Such evidence may be deemed a circumstance to be considered, in connection with other proof, in determining the guilt or innocence of the accused. *The State v. Adams,* 85 Kan. 435, 35 L. R. A., n. s., 870, 116 Pac. 608; *State v. Freeman,* 146 N. C. 615. . . . Alone and unsupported, such evidence is insufficient to sustain a conviction; there must be other and human testimony to convict. In this case there was an entire failure by the state to produce affirmative proof to justify the verdict of guilty." (p. 512.)

These authorities are in accord with the rule declared in *The State v. Adams,* supra, where it was held that the tracking of dogs "can be no proof of guilt, only some evidence that the party charged was at the place where the crime was committed and hence where he could have committed it." (p. 440.)

In treating of this class of evidence Professor Wigmore has said:

"Nevertheless, in actual usage, this evidence is apt to be highly misleading, to the danger of innocent men. Amidst the popular excitement attendant upon a murder and the chase of the suspect, all the facts upon which the trustworthiness of the inference rests are apt to be distorted in the testimony. Moreover, the very limited nature of the inference possible is apt to be overestimated, a consequence dangerous when the jurors are moved by local prejudice. Hence courts do well to insist on the strictest fulfillment of the above conditions of admissibility; and additional requirements are sometimes made. The hesitation shown in some courts to the use of this evidence is due to the risks of its misuse by the jury; for in some regions of our country the mysteriously accurate operation of the dogs' senses has given rise to a superstitious faith in the dogs' inerrant inspiration, and this gross popular creed might in a jury mislead them into giving excessive credit to the evidence of the dogs' itinerary." (1 Wigmore on Evidence, 2d ed., § 177.)

In a note to this text Professor Wigmore referred to an authority which held that bloodhound evidence alone was insufficient to convict, and added, "It seems odd that any court could deliberate one moment over such a preposterous assertion as the contrary."

We have no disposition to depart from or to minimize the decision in *The State v. Adams,* supra, but whatever force should have been given the bloodhound evidence in case there had been other substantial testimony connecting the defendant with the crime, we think it would be a very dangerous precedent to hold that a verdict

of guilty might rest on this evidence alone. The dogs as we have seen were on the trail going rapidly for about two hours and yet it appears that the movements of the defendant, if he committed the offense, from the time of the attack until he reached the garage only occupied a period of fifteen minutes or less. The assault must have been committed shortly after 9:30, the time Mrs. Ready left the telephone office. There was proof tending to show that defendant was at the garage about 9:45 o'clock. Of course that left time sufficient to have committed the offense, but it left little time for a change of clothes or the cleaning of spots from those worn. It was shown that when defendant reached the garage at 9:45 he exhibited no excitement and no spots were seen on his clothing nor evidence of a struggle or anything showing that he had been through such a criminal experience as was incident to the atrocious crime with which he was charged. Defendant's reputation was shown to be bad and testimony may be obtained upon which to base a conviction, but it is clear that the evidence disclosed in the record falls short of upholding the verdict of the jury.

The judgment will be reversed and the cause remanded for a new trial.