THE STATE OF KANSAS v. WILLIAM H. KLUSMIER.

**No. 13,841.**   (77 Pac. 550.)

SYLLABUS BY THE COURT.

PRACTICE, SUPREME COURT— *Technical Errors and Immaterial Exceptions Disregarded.* In a criminal appeal to this court judgment will be given without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the appellant.

Appeal from Jefferson district court; MARSHALL GEPHART, judge. Opinion filed July 7, 1904. Affirmed.

.*C. C. Coleman*, attorney-general, *H. F. Graham*, county attorney, and *Welch & Welch*, for The State.

*Hayden & Hayden, J. A. Rokes, A. E. Crane*, and *E. D. Woodburn*, for appellant.

The opinion of the court was delivered by

BURCH, J.: The appellant was convicted of the murder of his wife, and sentenced to hard labor in the penitentiary for fifty years. She had been beaten to death by blows upon the head with some blunt instrument, and by blows upon the body in the region of the heart, which produced a fracture of two ribs and copious internal hemorrhage. The appellant claimed she had opened the gates of death herself by that self-slaughter against which the Almighty has set his canon.

It would offend the pages of the journal of this court to spread upon them a full account of the distillation of the deadly venom of the defendant's icy heart; therefore, the gruesome facts disclosed by the record of the district court, including the defendant's brutish

treatment of the unpitied body of his wife, whose soul the accumulated bitterness of years had filled with wretchedness, will be referred to no further than is absolutely necessary to determine if the scales of justice were held by a steady hand throughout the prosecution.

The information was assailed by a motion to quash and by a motion to make more definite and certain. Upon its face the information appears to be direct, specific, and plain. The objections to it were couched in general terms. No attempt has been made, either in the brief or in the oral argument, to point out any particular in which the appellant was anywise embarrassed or imperiled in making his defense by the supposed blindness of the charge, and the conclusion must be that his constitutional right to demand the nature and cause of the accusation against him has been safeguarded.

When the appellant was arrested he immediately wrote in dust, and gave to the winds, a monstrous fabrication concerning his wife's death by suicide. An autopsy revealed neither external nor internal evidence of any war whatever between her neck and a suspended noose. When asked of bruises on the body he gave an explanation, and explanations multiplied as fast as his information of other mutilations grew. The examination of a witness disclosed that in the defendant's earliest narrative he had omitted to introduce the only invention adequate to account for the broken ribs. To escape from this predicament the defendant's counsel asked the witness on cross-examination the following question: "But at that time it was supposed she came to her death by a blow on her head?" The witness was not allowed to answer, and the defendant claims the right to a new trial for that reason.

The question made no reference to any statements concerning the cause of death, which were in fact communicated to the defendant, and which might have absorbed his attention for the time. It related merely to the bubbles of conjecture and surmise which had been blown upon the pipe of rumor, and which were floating about in the idle wind of gossip. Counsel for defendant understood this at the time, and proceeded to draw from the witness the details of his conversation with the defendant. The details were that the witness had told the defendant that his wife was wounded on the head and on the breast and on the thighs and on the abdomen, and that he did not tell the defendant she had come to her death by a blow on the head. The entire record considered, the assignment of error is trivial.

Some of the neighbors of the deceased woman were present at the coroner's inquest, and made a close examination of her neck. At the trial one of them said it was not in any other than a natural condition, and another said that so far as he could see it was in a natural condition. Technical objections to this testimony were argued at length, but it is not necessary to consider them. The testimony tended to negative the existence of external evidence of strangulation. There is no contradiction in the record of the fact that no such evidence existed. Some eight or ten witnesses examined the body when it was first discovered and exhumed, and found none. It was disinterred a second time, and a thoroughly scientific examination made, with the same result. Then the defendant caused the much mutilated remains to be dug up and ravaged once again for some slight sign of exculpation, and no external evidence of suicide was found. Therefore, the bits of evidence referred to were neither prejudicial nor important.

The defendant pretended that his wife had suffered an accident the evening before her death which might have broken her ribs.   He said he was present when it occurred, and claimed to have made the quick suggestion of a doctor's aid.   Concerning other matters, the defendant paraded himself as an ideally compassionate and sympathetic husband.   On cross-examination he was required to answer the following questions :   "How many times did you have a doctor when children were born?" (there had been nine of them) and "I will ask you if you did not complain of paying that ten dollars time and time again, to your wife?" Counsel for the defendant say the questions were calculated to give the impression that he was a low, coarse, brutal and degraded person.   But the defendant proved himself to possess a character so low, coarse, brutal and degraded that the vilest imputation which the state might make could not affect it. When, in his own defense, the defendant told upon the witness-stand of hiding the bruised and naked body of his wife for a day between bales of hay in the barn, of loading it at night without protection or covering upon the frame of a grain-drill, of driving with it afield, and then burying it face downward in a shallow ditch near the head of a ravine, he sunk into an abyss of infamy at which the very fiends must falter.

A Doctor Smith, who was introduced as a witness for the defendant, was not permitted to answer the following question :

"You may state to the jury whether in your opinion, after a person had been buried a month and a day and an examination of the brain had and the condition found as testified to by Doctor Tucker, a person could tell what caused the condition of that brain ?"

It is said that the question was intended to meet Doctor Tucker's opinion about the cause of the condition

of the brain.   Doctor Tucker had described the con-
dition of the deceased woman's brain, and from many
facts had given his opinion regarding the cause of
death, but he had not assigned a cause for the condi-
tion of the brain.   Therefore, the reason given for the
question fails.

Doctor Smith appears to have heard Doctor Tucker's
testimony for the state on a given day.   Subsequently
Doctor Tucker was recalled and gave additional de-
scriptions of the result of the autopsy held on the
body of the deceased, and gave opinions, based upon
his complete investigation, about the cause of death.
These descriptions and opinions Doctor Smith did not
hear.   The court refused to permit Doctor Smith to
give an opinion on the question whether or not the
wounds he had heard Doctor Tucker describe were
necessarily fatal, and the defendant asks that the
verdict against him be overturned for that reason.
From the manner in which the record is prepared it
is impossible to say upon what Doctor Smith's opinion
would have been based had he been permitted to an-
swer the question.   Therefore, error is not made mani-
fest.   But Doctor Smith was afterward recalled and
examined by means of hypothetical questions, ap-
parently to the extent of his knowledge and to the
extent of counsel's ingenuity, and every vestige of
prejudice, if the previous ruling were erroneous, was
eliminated.

From the demeanor of the defendant as a witness
in his own behalf, it would appear that he was inca-
pable of violence even in the vibration of his vocal
cords, and, probably for the purpose of rebutting the
natural conclusion that he was cringing like a self-
convicted felon, his attorneys undertook to prove that
soft speech was habitual with him.   The court per-

mitted them to prove his usual tone of voice, but declined to allow a witness to compare it with the way he talked the day before.   It is claimed that the conviction of murder was unwarranted on this account. Without any precedents for guides the court is inclined to follow the analogy of the common law, and to hold that after the defendant's every-day tones had been established the jury were as well qualified as anybody else to make comparison between them and the defendant's witness-box voice.   The practice here attempted to be inaugurated may be regarded as closed.

Certain questions were propounded to professional witnesses for the defendant and excluded, which called for the probable acts of an individual suffering from puerperal mania, and for an explanation of the witnesses' understanding of the term "puerperal mania."   The material matters then under investigation were the physical condition of the deceased, and the effect of that condition, if it were diseased, upon her mind.   The causes and symptoms of any disease from which she might be suffering, and which would affect her conduct, were proper matters of inquiry, and the effect of any disease upon her conduct was relevant.   But the court was not bound to permit the witnesses to wander further.   Therefore, the ruling of the court was correct.   But the witnesses answered a series of carefully considered questions developing the fact that a certain organ of the deceased was not in a normal state, and that the diseased condition which it disclosed would likely cause puerperal mania —an unsound condition of the mind.   They further described the symptoms of puerperal mania, and stated that it would produce an excited state, accompanied by wild talk and melancholia, a state of mental

depression, and one of them expressed the opinion that a suicidal tendency might be exhibited. Therefore, the whole matter sought to be elicited by the questions to which objections were sustained was fully exploited in a proper, scientific way, and the only controversy left is that between the court and counsel over the form of interrogatories, which is no longer of any importance.

The defendant asked the court to instruct the jury that the state must prove the absence of certain facts in order to establish guilt, as the absence of self-defense and of other justification or excuse. The request contained nothing more substantial than a play upon words. If a killing be wilful, deliberate, and premeditated, it cannot be justifiable or excusable; and if the burden be placed upon the state to prove a wilful, deliberate and premeditated killing, it already has the burden of proving a killing from which justification and excuse are absent. The burden was so imposed in this case. The same rule obtains with reference to all inferior degrees and crimes provable under the information, and the requested instructions were rightfully refused.

When a witness in his own behalf upon the trial, the defendant admitted that the only defense he had involved for its support the propagation of a prodigious lie, notwithstanding the fact that a lie will inevitably recoil upon the head of the liar and that the truth is profitable to all men at all times. In this appeal no assignment of error has been presented which merits more than passing consideration. It is the law that whosoever crawls upon the belly shall eat dust, and the judgment of the district court is affirmed.

All the Justices concurring.