No. 23,373.

THE STATE OF KANSAS, *Appellee,* v. RUFUS KING, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*When Evidence Relating to Other Crimes is Admissible.* In a trial for homicide, all pertinent facts which tend to prove the guilt or innocence of the accused are admissible; nor are such probative facts to be excluded merely because they may also prove or tend to prove that the accused has committed another crime or several crimes.

2. SAME—*Admissibility of Evidence of Other Crimes Similar in Character.* In a trial for murder, where the evidence tended to show that the victim had disappeared and was never afterwards seen alive and that the accused had possession of the victim's property and intimate personal effects at and after

the time of the victim's disappearance and that the skeleton of the victim was found buried in a livery barn lot which had been occupied by the accused at the time of the victim's disappearance, evidence tending to show the commission of two other murders, committed in substantially the same manner—the sudden disappearance of the victims, the resultant possession of their property and personal effects by the accused, and the exhumation and discovery of their remains on premises which were or had been in his possession, was admissible for the probative value of such facts in identifying the murderer of the victim in the case on trial.

3. SAME. Under the circumstances outlined in syllabus, paragraph 2, mere remoteness in time between the several homicides did not render the evidence pertaining thereto inadmissible.

4. SAME. Where the dominant facts pertaining to three homicides were so similar in character, in apparent motive, in common purpose, and in obvious results, as those outlined in syllabus, paragraph 2, and tended so convincingly to show that the victims must all have died through violence by a common hand, the facts pertaining to these homicides, whether committed before or after the one for which the accused was on trial, were admissible for their probative force in ascertaining the identity of the slayer in the case on trial.

5. SAME—*Requested Instructions Relating to Corpus Delicti Properly Refused.* In a homicide trial, no error was committed in refusing an instruction touching the significance to be attached to the unexplained absence of the victim without tidings from him for a long term of years, when no issue dependent upon such unexplained absence and want of tidings was involved, and where there was no reliance on a presumption of death to prove the *corpus delicti* or the defendant's guilt.

6. SAME—*Corpus Delicti.* The *corpus delicti* was well established by the evidence.

7. SAME—*Admission of Gruesome and Shocking Evidence.* The admission of competent evidence, no matter how gruesome and shocking it may be, does not deny to a defendant in a criminal case a fair trial as guaranteed by law.

Appeal from Osage district court; ROBERT C. HEIZER, judge. Opinion filed April 26, 1922. Affirmed.

*J. J. Schenck,* of Topeka, *C. E. Carroll,* of Alma, and *A. B. Crum,* of Lyndon, for the appellant.

*Richard J. Hopkins,* attorney-general, *John E. Martin,* county attorney, *Otis E. Hungate, A. E. Crane,* both of Topeka, *C. G. Messerley,* and *John McLaughlin,* both of Osage City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The defendant, Rufus King, was convicted of the murder of one John A. Woody, which crime occurred on or about the first of April, 1909. Woody was a young man who worked for

King in the spring of that year. King then operated a livery barn at Maple Hill in Wabaunsee county. About the first of April, Woody disappeared and was never afterwards seen alive. In August, 1919, the skeleton of Woody was found buried face downward in the livery barn lot, under the manure pile or thereabout. The hyoid bone of the throat of the skeleton had been fractured, indicating that Woody's death had occurred by strangulation or similar violent means. Woody was last seen alive by King, and after Woody's disappearance in 1909 King had in his possession and exercised rights of ownership over Woody's two horses, buggy and harness, and even had such intimate personal effects of Woody's as his overcoat, his picture as a baby, his photograph as a young man, the photograph of Woody's school teacher, his shaving mug, and a conch shell. He also claimed the right to Woody's saddle, which was in the possession of Woody's father, but the latter declined to surrender it on King's demand. These and many other more or less significant incidents—some of which will need consideration later in this opinion — constituted the evidence which made up the state's case of homicide against King, and his conviction of the crime of murder in the first degree followed.

King appeals. The principal error or series of errors upon which he relies for reversal relates to the admission in evidence of facts pertaining to two other murders which came to light about the time Woody's skeleton was found in the livery barn lot in 1919, and which *in extenso* were narrated to the jury. The facts involved in this evidence, the competency of which is strenuously challenged, tended to show that in 1906, while this same livery barn was in King's possession, one William T. Ringer, a Nebraska peddler, who wandered about the country attending public fairs and selling cheap jewelry, which he made of copper wire and small shells, came to King's livery barn and made it his headquarters for some time. Ringer disappeared. He was last seen alive by King. After his disappearance King had in his possession and exercised rights of ownership over all of Ringer's personal property—his deeds to properties in Nebraska, his spectacles, jewelry, and copper wire and shells for making jewelry, his collars, blankets, dog, horses and wagon. In August, 1919, Ringer's skeleton was found buried face downward in the lot of the livery barn near Woody's body, and the skull of Ringer's skeleton showed that it had been crushed by an axe or similar instrument.

The State v. King.

The facts tending to show the third homicide, which were developed over defendant's objection, tended to show that in 1913 a young farmer named Reuben Gutschall residing a few miles from Maple Hill suddenly disappeared and was never afterwards seen alive, and all his property immediately came into the possession of King, and King exercised rights of ownership over it—Gutschall's chickens, hogs, household goods, horses, wagon, harness, hay and sorghum. King sold part of these effects, and hauled away the remainder. Gutschall's watch was found on the road over which King hauled Gutschall's goods. In August, 1919, the bones of Gutschall's skeleton, or most of them, were found in a sack in a shed in the possession of King in Maple Hill. During that month and for many months prior thereto King was absent from Maple Hill, in Colorado and elsewhere. These bones indicated that they had once been buried and had been disinterred, and there were indications that Gutschall's death had been caused by violent means.

It cannot be gainsaid that the evidence pertaining to the violent death of Woody was sufficient to establish the crime of homicide. So, too, did the facts pertaining to the deaths of Ringer and Gutschall. In *Wilson v. United States*, 162 U. S. 613, 40 L. Ed. 1090, the evidence tended to show that the body of one Thatch had been found in a creek near which the defendant had camped. The defendant had in his possession five horses and a colt, a wagon, gun, bed clothing, and other property that had belonged to Thatch, and there was evidence that Thatch's death had been effected by violent means. The court said:

"Possession of the fruits of crime recently after its commission justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. 1 Greenl. Ev. (15th ed.) § 34. In Rickman's case 2 East P. C. 1035, cited, it was held that on an indictment for arson, proof that property was in the house at the time it was burned, and was soon afterwards found in the possession of the prisoner, raises a probable presumption that he was present and concerned in the offense; and in *Rex v. Diggles*, (Wills Cir. Ev. *53,) that there is a like presumption in the case of murder accompanied by robbery. Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of his death is always admissible, and the fact, with its legitimate inference, is to be considered by the jury along with the other facts in the case in arriving at their verdict. *Williams v. Commonwealth*, 29 Penn. St. 102; *Commonwealth v. McGorty*, 114 Mass. 299; *Sahlinger v. People*, 102 Illinois, 241; *State v. Raymond*, 46 Connecticut, 345; Whart. Cr. Ev. § 762." (p. 619).

But what about the admissibility of the evidence concerning these crimes involved in the deaths of Ringer and Gutschall when King was being tried for the murder of Woody? The admissibility of evidence touching other crimes perpetrated by a defendant on trial for any specified offense has been the theme of much discussion by courts and text-writers. The ordinary rule, of course, is that evidence of extraneous crimes is not admissible. But to that rule there are many well-recognized exceptions which are as ·potent as the rule itself. Any pertinent fact which throws light upon the subject under judicial consideration—the accused's guilt or innocence of the crime for which he is charged and on trial, is admissible; nor is such probative fact to be excluded merely because it may also prove or tend to prove that the accused has committed another crime or many crimes. (*The State v. Folwell*, 14 Kan. 105; *The State v. Adams*, 20 Kan. 311; *The State v. Reed*, 53 Kan. 767, syl. ¶ 6, 37 Pac. 174; *The State v. Calhoun*, 75 Kan. 259, 88 Pac. 1079; *The State v. Hansford*, 81 Kan. 300, 106 Pac. 738; *The State v. Chance*, 82 Kan. 388, 108 Pac. 789; *The State v. Wheeler*, 89 Kan. 160, 165, 130 Pac. 656; *The State, ex rel., v. Stout*, 101 Kan. 600, 606, 168 Pac. 853; *Smith v. Hern*, 102 Kan. 373, and citations, 170 Pac. 990; *The State v. Mathes*, 108 Kan. 488, 196 Pac. 607; *The State v. Ridgway*, 108 Kan. 734, 197 Pac. 199.)

In *The State v. Folwell*, supra, where the defendants were convicted of larceny, and on appeal complained of the admission in evidence of other larcenies, this court said:

"It is true, that this evidence tended to prove a distinct felony, and it will readily be seen that it was likely to injure the defendants; but the testimony was essential to show the guilt of defendants on the charge then being tried, and it would be a singular rule of law, that a person accused of a grave crime could compel the exclusion of important and relevant testimony merely by committing two felonies at the same time, or so nearly and intimately connected that the one could not be proven without also proving the other. The testimony was competent, not for the purpose of proving another felony, but as tending to show the guilt of the accused in this case. The authorities are not conflicting on this point. (Wharton Crim. Law, § 649.)" (p. 109.)

In *The State v. Adams*, supra, Judge Brewer said:

"Error is alleged in the admission of testimony, in this, that evidence was admitted which simply tended to show defendant guilty of another offense, and in no manner tended to connect him with the crime charged. The rule of law applicable to questions of this kind is well settled. It is clear, that the commission of one offense cannot be proven on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is

guilty of the latter, because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried. And on the other hand, it is equally clear, that whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. *The State v. Folwell,* 14 Kas. 105. A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes, and the same facts, or some of them, may tend directly to prove his guilt of all; and on the trial for any one of such crimes it is no objection to the competency of such facts, as testimony, that they also tend to prove his guilt of the others. By this rule, whatever is done in preparation for a crime, or in concealing the fruits, is competent, although in such preparation or concealment is committed another and distinct offense." (p. 319.)

In *The State v. Chance,* supra, it was said:

"A third complaint is that the state was permitted, in support of the charge of uttering the forged note, to introduce evidence tending to show that the defendant had forged the names of other persons to other notes for the purpose of increasing the apparent assets of the business, and thus covering up his shortage. This evidence had a tendency to prove him guilty of the very offense charged, and the fact that it also tended to prove the commission of other offenses did not render it inadmissible. (*The State v. Calhoun,* 75 Kan. 259; *The State v. Hansford,* 81 Kan. 300; 62 L. R. A. 252, note; 5 Encyc. of Ev. 868; 1 Wig. Ev. §§ 315, 318.)" (p. 391.)

In *The State v. Lowe,* 6 Kan. App. 110, 50 Pac. 912, the defendant was convicted of grave robbery committed in 1895. On appeal, he complained of the admission of prejudicial testimony which showed that at various times in 1894 and 1895 he had received payments from a medical college for dead bodies which apparently had been exhumed from cemeteries. He also complained of the very prejudicial admission of conversations in 1893 and 1894 between him and a witness, the sexton of a cemetery, touching this ghoulish traffic. The court of appeals said:

"This testimony was for the purpose of showing the connection of the defendant with the college. It tended to show the business the defendant was engaged in, and the intent and purpose he had in removing dead bodies. It tended to prove the intent of the defendant in removing the body of Amelia Van Fleet from its grave, and that the body was removed for sale and for dissecting purposes. It tended to show that the defendant was in the business of procuring bodies for the Kansas Medical College, for dissecting purposes. It tended to show that the defendant had been in and about the Kansas Medical College prior to the offense charged in this case, and that he was paid for his services, sometimes in cash and sometimes by orders. The evidence complained of was properly admitted for the purpose of show-.

ing the connection of the appellant with the Kansas Medical College, and for the purpose of showing the intent with which the acts done by the appellant were done." (p. 116.)

Now, the circumstances surrounding the deaths of Woody, Ringer and Gutschall, so similar in their dominant aspects, tended strongly to show that the murderer of one of these victims was the murderer of all three. The extended inquiry made into the details of the three crimes was bound to aid materially in disclosing the identity of their common perpetrator. Under the principle so often declared in the above quoted precedents of our own jurisdiction, the evidence touching the similar disappearances of Ringer and Gutschall, King's possession of their property upon their respective disappearances, his statements touching their disappearances, his statements explaining how he came to possess their effects, and the facts of the exhumation and discovery of their remains on premises that were or had been in his control, were competent and admissible to prove the common identity of the murderer of Woody, Ringer and Gutschall, and to prove his motive and system of possessing himself of other men's property—by taking their lives and concealing their bodies to accomplish that object. Being well assured that this evidence was competent under Kansas law, we shall not greatly extend this inquiry to see how harmoniously it accords with the law of evidence in other jurisdictions, but the following may be noted:

In *State v. Phelps*, 5 S. D. 480, one Frank B. Phelps was convicted of the murder of one Mot Matson. Phelps had induced one Henry Shroeder to shoot Matson. Evidence tending to show the commission of other crimes by Phelps was narrated by Shroeder. Part of the opinion reads:

"The witness Henry Shroeder, who testified that he fired the fatal shot, was permitted to testify fully concerning his relations with the accused, and to detail all conversations between himself and the defendant relating to the Matsons, including statements by the defendant that he had shot and killed persons on different occasions, giving particulars as to time, place and circumstances, and that no effort was made to prosecute him therefor, and that, if he (Shroeder) would kill the Matsons, no one would suspicion him, and that nothing would be done about it. He further testified that, about the time the defendant was attempting to induce him by the promise of reward, and by the force of threats, to kill the Matsons, he also advised him to steal for his own use a span of horses, from a herd that was running at large in the neighborhood, and to bring them onto the island; and the defendant assured him that the horses would never be discovered, and that everything would be all right. We think this evidence was competent to show the suc-

cessive steps taken by the defendant to place the witness in an attitude that would seal his lips—put him under the influence and control of the defendant, and thus enable him, through the agency of the witness to carry out the scheme which resulted in the murder for which the defendant was placed upon his trial.  .  .  .

"To attempt to quote all or any considerable part of the testimony of this witness, which is at great length, would needlessly extend this opinion beyond reasonable limits, and we will dismiss the subject with the observation that the numerous objections of learned counsel to the various questions put to this witness were properly overruled by the court, and the evidence was submitted to the jury, under suitable instructions as to the manner of weighing and determining the value of the same." (pp. 487, 489.)

(See, also, cases cited in Abbott's Trial Brief, Criminal Causes, 2d ed., 519.)

In *People v. Grutz*, 212 N. Y. 72, 56 L. R. A., n. s., 229, 230, 231, which was an arson case in which evidence of other similar crimes by the accused was ruled out, Werner, J., who had written the majority opinion in the Molineux case, said:

"It is one of the distinguishing features of our common-law system of jurisprudence that, as a general rule, a person who is on trial charged with a particular crime may not be shown to be guilty thereof by evidence showing that he has committed other crimes.  .  .  .

".  .  .  There are, however, certain recognized exceptions to this general rule which cannot be scientifically classified or enumerated, but which by common consent have long been grouped under five or six separate heads. Evidence of other crimes is, of course, always admissible when such evidence tends directly to establish the particular crime; and evidence of other crimes is usually competent to prove the specific crime when it tends to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, (5) the identity of the person charged with the commission of the crime on trial." (pp. 76, 77.)

(See, also, extended note to the case of *People v. Molineux*, [N. Y.] 62 L. R. A. 193; and note in 43 L. R. A., n. s., 776; 16 C. J. 586, 600; 14 Cent. Dig., Crim. Law, §§ 822-846; 6 Dec. Dig., Crim. Law, §§ 369-372.)

Some English cases are in point: In *The Queen v. Mary Ann Geering*, 18 Law J. Rep., n. s., (M. C.) 215, the headnote reads:

"On an indictment against a prisoner for the murder of her husband by arsenic, in September 1848, evidence was tendered on behalf of the prosecution of arsenic having been taken by the prisoner's two sons, one of whom died in December and the other in March subsequently, and also by a third son who took arsenic in April following, but did not die. Proof was given of a similarity of symptoms in the four cases. Evidence was also tendered that the prisoner lived in the same house with her husband and sons, and that

she prepared their tea, cooked their victuals and distributed them to the four parties—Held, that this evidence was admissible for the purpose of proving, first, that the deceased husband actually died of arsenic; secondly, that his death was not accidental; and that it was not inadmissible by reason of its tendency to prove or create a suspicion of a subsequent felony."

The opinion reads:

"Pollock, C. B.—I am of opinion that evidence is receivable that the death of the three sons proceeded from the same cause, namely, arsenic. The tendency of such evidence is to prove and to confirm the proof already given, that the death of the husband, whether felonious or not, was occasioned by arsenic. In this view of the case, I think it wholly immaterial whether the deaths of the sons took place before or after the death of the husband. The domestic history of the family during the period that the four deaths occurred is also receivable in evidence, to show that during that time arsenic had been taken by four members of it, with a view to enable the jury to determine as to whether such taking was accidental or not. The evidence is not inadmissible by reason of its having a tendency to prove or to create a suspicion of a subsequent felony. My Brother Alderson concurs with me in thinking that the evidence ought to be received.

"The prisoner was convicted." (p. 216.)

In *Reg. v. Banks,* 12 Cox C. C. (1873), 400, where a defendant was charged with the murder of her stepchild by poison, to meet the defense of accidental poisoning evidence was held admissible to show that two other children of the defendant and a lodger in her house had died from poisoning.

*Makin v. Attorney-general,* Law Reports, H. L. App. Cas. (1894), 57, was a review of a case in which Makin and wife had been convicted of the murder of a child in New South Wales. Evidence had been introduced which tended to show that the defendants had been guilty of murdering several other children. It was shown that during the month of October, 1891, the bodies of two children were found on premises in McDonaldtown. On November 1 and 3 the bodies of four children were found on the same premises. On November 9, the remains of four children were found on premises in Redfern, and on November 12, remains of two children were found on premises in Chippendale. It was shown that all these premises in McDonaldtown, Redfern, and Chippendale at one time or another had been in the possession of the defendants. The theory of the prosecution was that the defendants had been engaged in receiving children for parents or other kindred who desired to be rid of them and that they disposed of such children by murdering them and burying the bodies of the victims. The fact was shown that some

The State v. King.

such children, other than the one for whose murder the defendants were on trial, had been so received by defendants and that such children had mysteriously disappeared. The prosecutors contended:

"Evidence was therefore admissible to support this inference by the recurrence of the unusual phenomena of bodies of babies having been buried in an unexplained manner in a similar part of premises previously occupied by the prisoners. . . . It was the general and not the exceptional rule of law to admit such evidence to rebut defense of accident, and to show existence of motive and a systematic course of conduct. . . . That any evidence is admissible of any acts or doings of the person accused if such acts or doings are so connected with the transaction under charge or are of a character so similar thereto as to lead to a reasonable inference that the prisoner committed the act charged, or at the least that such act if committed was willful and not accidental." (p. 63.)

The court said:

"Under these circumstances their Lordships cannot see that it was irrelevant to the issue to be tried by the jury that several other infants had been received from their mothers on like representations, and upon payment of a sum inadequate for the support of the child for more than a very limited period, or that the bodies of infants had been found buried in a similar manner in the gardens of several houses occupied by the prisoners." (p. 68.)

The mere remoteness in point of time between the prior murder of Ringer and the subsequent murder of Gutschall did not render the evidence touching these homicides inadmissible. (*The State v. Ridgway*, supra; *The State v. Lowe*, supra; *State v. Kent*, 5 N. D. 516, 27 L. R. A. 686; *State v. Pancoast*, [N. D.] 35 L. R. A. 518; *Russell v. The State*, 11 Tex. App. 288; 16 C. J. 602.)

But it is urged that our own cases (*The State v. Boyland*, 24 Kan. 186; *The State v. Kirby*, 62 Kan. 436, 63 Pac. 752; *The State v. Wheeler*, 89 Kan. 160, 130 Pac. 656; *The State, ex rel., v. Stout*, 101 Kan. 600, 168 Pac. 853; *The State v. Sweet*, 101 Kan. 746, 755, 168 Pac. 1112) all recognize the rule that evidence of subsequent offenses is not admissible, which rule, if pertinent here, would exclude all evidence touching the murder of Gutschall in 1913. The answer to that contention is that if the circumstances surrounding the death of Gutschall had no value in determining the identity of the murderer of Woody, they would be altogether inadmissible under the Boyland case and its succeeding precedents—and under all the rules of evidence as well, whether the killing of Gutschall and its incidents occurred before or after the death of Woody; but since these facts (and those pertaining to the death of Ringer as well) were so similar in character, in apparent motive, in common

purpose, and in obvious results, that they very persuasively disclosed that Gutschall, Ringer and Woody must have died by violence by a common hand, perpetrated substantially in a common manner, such facts were admissible whether they transpired before or after the homicide involved in Woody's death. Such facts were highly probative in ascertaining the identity of the slayer of Woody, and they were therefore admissible. (*The State v. Stone,* 74 Kan. 189, 85 Pac. 808; *The State v. Hibbard,* 76 Kan. 376, 92 Pac. 304; *The State v. Brown,* 85 Kan. 418, 116 Pac. 508; *State v. Reineke,* 89 Ohio St. 390, 53 L. R. A., n. s., 138; *Melton v. State,* 63 Tex. Crim. Rep. 362, 140 S. W. 23; *Makin v. Attorney-general,* supra; *The Queen v. Mary Ann Geering,* supra; 16 C. J. 600, 602.)

The trial court properly limited the significance to be attached to the evidence pertaining to the murders of Ringer and Gutschall and the possession of their property by the defendant. The instructions read:

"(8) Evidence has been admitted in this of the finding of part of a skeleton on August 5th, 1919, and also of a skeleton on August 14th, 1919, at Maple Hill, Kansas, and also evidence tending to show that Rufus King was in possession of certain property formerly owned by Reuben Gutschall and W. F. Ringer; this evidence was only permitted for the purpose of identifying, if possible, who it was that killed John A. Woody, if you find from the evidence that he has been killed in the manner and at the time and place set out in the information, and you are instructed to consider it for no other purpose.

"(9) You are further instructed, Gentlemen of the Jury, that the defendant is not on trial for the killing of W. F. Ringer or Reuben Gutschall, but is only being tried for the felonious killing of John A. Woody."

Complaint is made because of the trial court's refusal to instruct the jury that the fact that Woody had been absent and unaccounted for since April, 1909, would not warrant a finding that Woody was dead. Such instruction would hardly have been pertinent. The state made no attempt to establish the death of Woody by the mere legal presumption of his death arising from his unexplained absence from home and kindred for a long period of years, unheard from by those likely to receive tidings from him if he were alive. On the contrary the state's case was consistently prosecuted on the theory that Woody was slain and buried in the livery barn lot by defendant in 1909 at the time when the young man disappeared and when defendant became possessed of his property. That, too, was the state's consistent theory in all its evidence touching Ringer in 1906 and Gutschall in 1913. Here there would have been no pur-

pose to serve, no point to be made, by giving the requested instruction.

The *corpus delicti* was well established in the case on trial. Indeed it was equally well established as to Ringer and Gutschall. (*The State v. Winner,* 17 Kan. 298; *Wilson v. United States,* supra. See, also, Chief Justice Shaw's charge to the jury, in *Trial of Prof. Webster,* [Cockcroft & Co., N. Y., 1879] 548, 556 *et seq.*) We say this, regardless of the testimony given at the trial, and regardless of the largely cumulative evidence given in support of the motion for a new trial, which was offered to show that Gutschall had been seen alive as late as 1918 in St. Joseph, Mo., and that Woody had been seen alive near Topeka and also in Rossville in 1910, in Corning, Iowa, in 1910 and 1911, and in Los Angeles in 1920. In view of the overwhelming mass and character of the evidence tending to prove the *corpus delicti* and the guilt of defendant, we do not marvel that the jury gave no credence to the testimony offered to show that Woody was seen alive after April, 1909, or that Gutschall was seen alive later than December, 1913; or that the trial court similarly discredited the showing to the same general effect which was offered in support of the motion for a new trial.

And here, to keep the scope of this opinion within reasonable limits, we ought to stop. We have not attempted to narrate all the incidents of evidence offered by the state nor the testimony submitted on defendant's behalf. That would serve no purpose in this appeal. The determination of the facts was the function of the jury, not ours; but aside from the one perplexing circumstance of the existence of Gutschall's bones in a sack in defendant's shed, and that defendant by letter from Colorado authorized an acquaintance in Maple Hill to sell all the contents of the shed to a junk dealer—a thing it seems incredible that he would have done if he knew or remembered that the sack with its gruesome contents was among the chattels of that shed—all the credible evidence was consistent with defendant's guilt and practically none of it persuasively consistent with his innocence. In a homicide case where the guilt of the defendant was far less clear and which contained circumstances much more perplexing than the single incident narrated above, this court said:

"Singular, mysterious and inscrutable as was the killing of the deceased by the defendant, as found by the jury in this case, yet, the jury upon sufficient evidence having found the act of killing to have been done by the defendant, and no justification therefor having been shown, and no error of law

appearing in the record, the conviction must stand." (*The State v. Dull*, 67 Kan. 793, 800, 74 Pac. 235.)

In the brief of defendant and in the oral argument of his counsel, it has been strongly contended that the defendant did not get a fair trial, that the notoriety of the incidents touching the discovery of the remains of Woody, Ringer, and Gutschall so inflamed the public mind that even the change of venue from Wabaunsee county to Osage county which was granted by the trial court did not and could not relieve the defendant of that handicap, that the parading of the skeletons of the three victims before the jury severely prejudiced him, and that notwithstanding the court's instructions that the defendant was only on trial for the killing of Woody and not for the killing of Ringer and Gutschall, the length and detail of the testimony touching the deaths of the latter and defendant's entanglement therewith was bound to confuse the jury and prevent their dispassionate consideration of the cause for which alone he was on trial. These are circumstances which the trial court could better consider than we can. This court is bound by the record and that record does not disclose reversible error in any of these respects. Since the evidence complained of, shocking, gruesome, and ghastly as it was, was competent, the fact that it prejudiced defendant before the jury was an unavoidable consequence. No matter how damaging to a defendant the admission of competent evidence may be, its admission and the consequences of its admission do not justify a disturbance of the judgment, nor deprive the defendant of a fair trial as guaranteed by law. (*The State v. Klusmier*, 69 Kan. 760, 77 Pac. 550.)

The judgment is affirmed.