No. 29,201.

The State of Kansas, *Appellee*, v. Frank Irey, *Appellant*.

(283 Pac. 495.)

Opinion filed January 11, 1930.

*Owen S. Samuel,* of Emporia, for the appellant.

*William A. Smith,* attorney-general; *R. O. Mason,* assistant attorney-general; *A. A. Hotchkiss,* county attorney, and *A. K. Stavely,* of Lyndon, for the appellee.

The opinion of the court was delivered by

Burch, J.: Defendant was convicted of arson, and appeals.

In the early morning of January 11, 1929, the dwelling house of Nora J. Rankin burned. The house was located about five miles north and three miles east of Melvern. Bert Norton, who lived about one hundred yards southwest of the house, discovered the fire about five o'clock. The house was then enveloped in flame. Mrs. Rankin was the wife of the sheriff of the county, J. T. Rankin, whose term expired on January 14. The house had been undergoing remodeling, and was not occupied. It was old, and the timbers were dry. Mrs. Rankin had been in the house on the 10th and had fire in it, but she said she put out the fire about four-thirty in the afternoon.

There was bad feeling between defendant and the sheriff. Defendant had been arrested many times, had pleaded guilty to minor offenses, such as being drunk, disturbing the peace, and violation of the liquor law, but had never been convicted by a jury, and had been acquitted of bootlegging at the term of court preceding the term at which the arson trial occurred. The sheriff had himself arrested defendant seven times. Defendant testified the sheriff was always "jumping him up"; if anything happened in Melvern he was

"the fall guy"; he knew of nothing in two years "they didn't implicate him into but one," which it seems involved driving a car, and defendant could not drive a car. Defendant testified the sheriff had cursed him, and cursed him in the courthouse, had abused him, had offered to fight him, and had said he ought to be in jail or in the penitentiary. The sheriff did not deny these charges, and defendant freely admitted expressing his opinion of the sheriff in very uncomplimentary terms.

A witness for the state testified he had never heard defendant make any threats against the sheriff, but he heard defendant say several times he would get even with the sheriff. Neither time nor occasion was stated. Defendant said it was at election time, he "voted Democrat," and he said, "Here is a damn good chance to get even with Rankin."

To connect defendant with the fire, the state produced an exconvict, Sherman Brown, who had served thirty-five months in the Missouri state penitentiary for burglary. Brown said that on January 10 he took five gallons of whisky from Kansas City to Melvern in a Ford car, and met defendant in Melvern about eight-thirty or nine o'clock in the evening. The following is the abstract of other portions of Brown's testimony:

"Did not see the defendant any more until about midnight, when he met him in a restaurant; stated that the defendant came into the restaurant; had no conversation with him, and the two of them left the restaurant about twelve-twenty a. m.; after they had left the restaurant, the defendant told the witness he knew where there was some whisky, and asked the witness if he would get it; did not tell where it was located, and said nothing other than related; that they went to the car, which was across the street, got into the car, and headed north; stated that the defendant told him to drive north out of Melvern; that he did so; drove out of Melvern about two miles; stopped and picked up some whisky which the witness had hidden, and after picking up the whisky he continued driving north; that the defendant did not say how far to go, but after driving north a distance of five miles he turned east; the defendant said nothing to him, except told him to stop at the schoolhouse; that the defendant informed him that was where the whisky was; witness stopped the car, and the defendant got out and was gone about half an hour; after he had been gone half an hour he returned, cussed a little about the whisky being gone, got into the car, and they drove back to Melvern. The schoolhouse where the car was stopped was about two hundred yards south and seventy-five to one hundred yards east of the dwelling house that was burned; stated that they arrived at the schoolhouse about one, one-thirty, or two o'clock; that they got back to Melvern about three o'clock in the morning. The defendant got out without saying anything further to the witness, and he then drove to Ottawa, a distance of something like twenty-four miles,

arriving there about four or four-thirty; testified that after he left Melvern he went back over the same route he and the defendant had taken on the way out to the schoolhouse, but he did not notice the house was burning when he went back to Ottawa."

There was testimony that the light of an automobile was seen coming from the west between one and two o'clock in the morning, which did not pass the schoolhouse, and a garage keeper in Ottawa testified Brown arrived at his place shortly before four o'clock in the morning.

There was no evidence the building was set on fire later than approximately two a. m., and there was no evidence that defendant took with him to the schoolhouse proper facilities for setting a slow fire.

Some testimony was given relating to conduct and statements of defendant after the fire. Some of the testimony was trivial, most of it was inconsequential, and all of it, if fairly considered, was reconcilable with defendant's innocence.

To bolster up its case, the state undertook to prove defendant burned a barn nearly thirteen years before the fire in issue occurred. Jacob Alt testified that in April, 1916, he was on the street talking with Ben Kramer. Defendant called Alt over to him, and said, "You had me arrested." Alt said, "I didn't." Defendant said, "I am going to fix you. You will pay for it. I am a bad man." That night Alt's barn burned, and Alt did not see defendant for about six months.

A witness testified that between nine and ten o'clock the night of the Alt fire she saw defendant and another man at the rear of the hotel, a block away from the barn. The barn burned about twelve-thirty a. m. Shortly after the fire—the witness did not know when—defendant left Melvern for a while. Defendant testified—and his testimony was not disputed—that at the time of the Alt fire he was living at the hotel, and the entrance to his room was at the rear of the hotel, near where the witness saw him.

Kramer got the subject of burning Alt's barn into the conversation between defendant and Alt. This was, of course, a very important matter. Alt, who engaged in the conversation with defendant, and whose barn was burned, said nothing about it in his testimony. Kramer's testimony reads:

"Q. Did he say anything further (same objection interposed)? A. If I am not mistaken, he said, 'What are you going to do with me?'

"Q. Alt said, 'What are you going to do with me?' A. Yes. He said, 'You ain't going to burn me up?'

"Q. What answer did Irey make to that? A. He made no answer."

The testimony relating to the Alt fire was erroneously admitted, a motion to strike it out was erroneously denied, and the court intensified the error by instructing the jury as follows:

"Evidence has been admitted in this case that about the year 1916 the defendant became angry with one Jacob Alt for the reason that he, Irey, believed that he had been arrested at the instance of said Alt; that soon thereafter the Alt barn was destroyed by fire, and that after said fire the defendant, Frank Irey, was away from his usual place of residence for several months. This evidence is permitted only to show, if possible, the malice and intent of the defendant toward the Rankins before the destruction of the house described in the information, to show that such destruction was not accidental, and to show who it was, if possible, set said house on fire, if you find from the evidence beyond a reasonable doubt that said house was burned at the time and in the manner set out in the information. You are further instructed that you are not to consider the evidence relating to the burning of the Jacob Alt barn, or the possible connection of the defendant therewith, for any other purpose than that above set forth."

The state undertook to justify admission of the testimony relating to the Alt fire by the cases of *State v. King,* 111 Kan. 140, 206 Pac. 883, and *State v. Ridgeway,* 108 Kan. 734, 197 Pac. 199. There is no similarity between those cases and this one. In this instance, years after the event, the state tried to create a suspicion that defendant burned Alt's building, for the purpose of strengthening a suspicion that defendant burned Rankin's building.

It is clear the judgment of the district court is erroneous. What should be done with the case is not so clear. With hesitancy the court concludes there may be a new trial.

The judgment of the district court is reversed, and the cause is remanded with direction to grant a new trial.

JOCHEMS, J., not participating.