No. 46,036

STATE OF KANSAS, *Appellee,* v. CALVIN JOHNSON, *Appellant.*

(502 P. 2d 802)

Opin-
ion filed November 4, 1972.

*Robert D. Beall,* of Leavenworth, argued the cause, and was on the brief for the appellant.

*Patrick J. Reardon,* County Attorney, argued the cause, and *Vern Miller,* Attorney General, and *John A. Price,* Special Prosecutor, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is a criminal action in which Calvin Johnson (defendant-appellant) was convicted by a jury of murder in the first degree (K. S. A. 21-401, now K. S. A. 1971 Supp. 21-3401) and sentenced to a term of life imprisonment in the Kansas State Penitentiary. At the time of the offense charged herein, defendant was serving two life sentences for two previous convictions of murder in the first degree.

A summary of the facts, as disclosed by the evidence presented at the trial, is essential for an understanding of the several issues raised by defendant in his appeal.

On February 25, 1968, when the offense for which he was convicted occurred, defendant was confined in cell 203 in the Adjustment and Treatment Building together with three other inmates—Steve Boster; Basil Terry and, the victim, William E. Barfield.

About midnight on February 24-25 Lee F. Baragary, a correctional officer assigned to the Adjustment and Treatment Building (hereinafter referred to as A & T Building), while delivering medication to an adjacent cell, passed by cell 203. He testified that everything appeared to be in order at that time. After Baragary returned to the control center he heard a loud moaning and went back to the cell area where he found—in cell 203—Barfield bleeding and in a great deal of pain from what appeared to be puncture wounds.

Officers Ronnebaum; Little and Rector soon arrived at the scene and found inmates Terry and Boster in their bunks and apparently asleep. Defendant Johnson was sitting on his bunk. Defendant, Terry and Boster were searched and removed from the cell. Barfield was taken to the penitentiary hospital where he was treated for multiple puncture wounds.

Barfield was later taken to the University of Kansas Medical Center where he died about 7 a. m. on February 27, 1968. Dr. William Strutz, of Leavenworth, performed an autopsy on the same day. Dr. Strutz is a diplomate of the American Board of Radiology and former coroner of Leavenworth County. He testified that the autopsy disclosed puncture wounds below the right eye; one on the left of the sternum or breast bone; another on the right of the sternum, but much lower than the wound on the left; and a puncture wound on the left side of the chest that had been sutured. He

also found a small puncture wound in the apex of the heart. Dr. Strutz further testified that his examination of Barfield's head revealed the condition "to be one of the more severe brain damage cases that he had performed an autopsy on." He testified that the skull showed multiple traumas to the brain, but that the soft tissues surrounding the skull were not injured. On further examination Dr. Strutz was questioned concerning how the brain could receive such severe traumas and without damage to the external soft tissues. His verbatim testimony on this point is as follows:

"Q. Well, in your opinion, Doctor, is there any way in which one could avoid damage to the scalp or any of the soft tissues of the scalp and still receive trauma?

"A. I am sure there are ways it could be done.

"Q. How?

"A. Well the head would have to be protected.

"Q. Could this head have been protected by a blanket or sheet wrapped around it?

"A. It could.

"Q. If a sheet was wrapped around the head, and the head was struck against concrete or steel would this have been sufficient to cause this massive brain damage?

"A. If the sheet was thick enough if this sheet was thick enough, yes it could be done.

"Q. It could have been done without any apparent injury to the skull?

"A. Without any visible injury to the head or scalp."

Dr. Strutz further testified that massive brain damage could have been caused without any apparent injury to the head if the head was wrapped in a sheet or cover and banged against the wall or floor of the cell, such as 203.

The state offered further medical testimony by Dr. Richard McKee, who treated Barfield at the penitentiary, and by Dr. Edwin McGee, surgeon in charge of the emergency room at the University of Kansas Medical Center when Barfield was admitted there.

Other evidence was developed by the testimony of correctional officers and inmates which will be referred to in discussing the points raised on appeal.

Defendant submits five specifications of error which will be examined in the order presented.

Defendant first contends the trial court erred in the admission of two photographs (exhibits 6 and 7) showing the arrangement and contents of cell 203, including Barfield's bunk. The exhibits were offered by the state during the testimony of Kenneth Hockenberry, a correctional officer. Hockenberry identified Barfield's bunk

as shown in both exhibits. He testified the photographs reflected cell 203, as it was found immediately after Barfield was discovered, when Hockenberry saw the cell himself. Hockenberry did not know when the photographs were taken, which was the basis of defendant's objection on the ground that there was insufficient foundation established to show that the cell was in the same condition when the photographs were taken as it was when Barfield was discovered. Later in the trial it was developed by the testimony of inmate Bletz, who testified for the defendant, that photographs were not taken until the morning after the crime.

Lieutenant Little, of the penitentiary guard force, also used the photographs in his testimony to show the location of Barfield's bunk and the position of his body. Little and Hockenberry were the first two officers to enter the cell after Barfield was discovered. Both Little and Hockenberry testified that to the best of their recollection the photographs fairly represented the condition of the cell following the discovery of the crime. Their testimony established that the photographs were substantially true and accurate representations of cell 203. The time at which a photograph offered in evidence was taken is important only with reference to the question of change, or probability of change, in the condition of the object or person portrayed. (29 Am. Jur. 2d, Evidence, § 789, p. 865.)

In *State v. Jefferson,* 204 Kan. 50, 460 P. 2d 610, we said:

". . . Photographs are. generally admissible after proper foundation and identification if they accurately represent an object material and relevant to an issue in the case. Their admission rests in the judicial discretion of the judge and in the last analysis the weight to be given them is left to the jury. . . ." (p. 54.)

Actually, the photographs were used by officers Little and Hockenberry for the purpose of aiding the jury with a description of the cell and its contents. The photographs were only evidence in support of the testimony of Little and Hockenberry, both of whom had personally viewed and examined the cell immediately after the crime. Their testimony was the best evidence, but the admission of the photographs was not in violation of the best evidence rule which has no application to the admission of pictures of the scene of a crime. (*State v. Emery,* 201 Kan. 174, 440 P. 2d 613.) We believe the issue raised by defendant in connection with the admission of photographs goes to the credibility of Little and Hockenberry as witnesses, and the weight to be given to the photographs as supportive evidence rather than to their admissibility. We find no

abuse of discretion by the trial court in admitting the photographs into evidence.

Defendant next contends the trial court erred in admitting evidence offered by the state of two prior convictions of first degree murder. The court heard the arguments concerning this matter in the absence of the jury. The county attorney offered the evidence pursuant to the provisions of K. S. A. 60-455 declaring the purpose thereof in these words:

". . . [I]t is most relevent (*sic*) for us to prove the intent of this defendant, identity and I think preparation also or analogous relevent (*sic*) fact. Accordingly I think that at least for the purpose of identity, for the purpose of intent that this man did this with malicious intent, these prior convictions must be admisable (*sic*). There is no question that prior convictions were similar they are in fact exactly the same thing, they are murders in the first degree of another human being by stabbing and beating. . . ."

Defendant's counsel did not direct his objection specifically to the purposes enumerated by the county attorney but argued generally that the prior convictions were not relevant and served only to prejudice the jury. Defendant makes essentially the same argument on appeal, stating in his brief:

"It is submitted, under the facts disclosed by the record and as extracted in the abstract of this matter, that the sole purpose of the prior convictions was to prejudice the jury and was not offered for any of the permissible exceptions; that in this situation, relevancy was far outweighed by the prejudice created."

The trial court, after hearing arguments of counsel and examining the documentary evidence, found both prior convictions to be relevant and they were admitted.

Defendant's first prior conviction occurred in 1962 and, as described in the record, consisted of the murder of one Weslay Canttrell by:

". . . [S]tabbing, cutting and wounding the said Weslay Canttrell with a deadly and dangerous weapon capable of producing death, to-wit: A homemade knife approximately (twelve) inches long with a blade approximately (eight) inches long, thereby causing and inflicting certain dangerous and deadly mortal wounds from which the said Weslay Canttrell did languish and die on the ninth day of May, AD, 1962. . . ."

The second conviction occurred in Leavenworth County in 1965 and, as shown by the record, consisted of the murder of one James A. Guthrie:

". . . [S]tabbing the said James A. Guthrie in the back, shoulder and the stomach with a deadly weapon capable of producing death, to-wit: A

knife, there by causing and inflicting dangerous and mortal wounds from which the said James A. Guthrie did languish and did [die] on the ninth day of February, 1965. . . ."

Obviously, the previous homicides, which were committed by stabbing the victims at numerous points of their bodies, were similar to and, in fact, almost identical with the characteristics of the offense for which defendant stands charged in the instant case. The similarity is certainly sufficient to establish the prior convictions as relevant evidence on the issue of the identity of the perpetrator in the instant case.

In connection with the admission of the prior murder convictions, the trial court submitted a limiting instruction which was not objected to by defendant who merely says on appeal that the instruction did not cure the prejudicial admissions.

As we are best able to discern from the record, the state's proffer of prior convictions came near the close of the state's case in chief. At this juncture of the trial all of the state's evidence concerning the nature of Barfield's wounds had been submitted. Dr. Richard McKee, a Leavenworth physician who was called immediately after Barfield's injuries were discovered, examined Barfield about thirty minutes after the incident. Dr. McKee testified that from the nature of the wounds the weapon used was something "like a ballpoint pen. He did not think it was a knife, ice-pick or file, but was a large, round, pointed instrument about the size of a pen."

In the two prior convictions, the injuries resulting in death consisted of beating and multiple stabbings, inflicted in one instance by a knife and in the other by a homemade knife. In the instant case the weapon was never found, but in view of Dr. McKee's description of the Barfield injuries, the manner in which they were inflicted, and the nature of the weapon used puts beyond question the similarity of the offenses. Where one or more of the elements or incidents of an offense enumerated as exceptions under K. S. A. 60-455 is an issue in the case, we have repeatedly held that the similarity of the two offenses makes the previous conviction relevant. (*State v. Holsey*, 204 Kan. 407, 464 P. 2d 12; *State v. Jenkins*, 203 Kan. 354, 454 P. 2d 496; and *State v. Dearman*, 203 Kan. 94, 453 P. 2d 7, cert. den. 396 U.S. 895, 24 L. Ed. 2d, 173, 90 S. Ct. 194.)

Concerning the matter of relevancy, with respect to the purposes enumerated by the county attorney at the time of his proffer, we believe the evidence of the previous similar homicides was of

particular probative value on the issue of identity which was the crucial fact to be established in the instant case. To identify a defendant as a perpetrator of the crime charged, it may become necessary to show former acts of his similar to those of the perpetrator of the crime charged. (2 Wigmore on Evidence, § 306, pp. 206-207.) In a comprehensive discussion of the subject of the admissibility of extraneous crimes as evidence appearing in Vol. 20 Kansas Law Review, the author, concerning proof of identity, states: "The quality of sameness *is* important when pondering the admission of other crimes to prove identity." (M. C. Slough, Other Vices, Other Crimes: An Evidentiary Dilemma, p. 420.) The case of *State v. King*, 111 Kan. 140, 206 Pac. 883, illustrates the significance as proof and the rationale for the admission of other crimes evidence to establish identity in a homicide trial. In the *King* case it was held that the dominant facts surrounding two previous homicides were admissible for their probative force in ascertaining the identity of the slayer in the case on trial. While the previous crimes evidence in the instant case may have been of minimal probative value with respect to intent and preparation which were mentioned by the county attorney, we find no prejudicial error in this regard. Moreover, the defendant's objection was not directed at this aspect of the state's proffer.

While the evidence of the prior murder convictions may have been damaging to his case, as claimed by defendant, prejudice, if any, was far outweighed by the probative value on the issue of identity in the instant case.

We find no error in the admission of the previous murder convictions.

Defendant's third contention of error is the denial of his motion for a new trial. He submits several arguments on this point. First, he claims a state witness, Oliver Nicolay, committed perjury when he testified that he overheard a conversation between defendant and Boster, on how to kill a person by hitting vital areas of the body. Nicolay also testified at the trial of Boster subsequent to defendant's trial. At the Boster trial a question arose as to whether Nicolay was an inmate at the A & T Building at the time he overheard the Boster-Johnson conversation. In the Boster trial the state moved to strike Nicolay's testimony because the county attorney thought the records of the penitentiary indicated that Nicolay was not in fact confined in the A & T Building at the time. Defendant claims he was denied an opportunity in his trial to rebut

Nicolay's testimony or establish perjury because Nicolay was not endorsed as a witness until after the trial was commenced. The record does not support defendant's position. The record shows that defendant was given an opportunity to talk to Nicolay before he was called as a witness and no request for a continuance is shown, nor does the record reflect a motion by defendant to bar Nicolay as a late endorsement.

A trial court, in its sound discretion, may permit or deny the endorsement of additional witnesses on the information at any time subsequent to the filing thereof, including during the trial, and its discretion will not be disturbed on appeal unless it is clearly shown it abused its discretion, and the abuse resulted in material prejudice to the defendant. (*State v. Campbell*, 207 Kan. 152, 483 P. 2d 495; *Peterson v. State*, 203 Kan. 959, 457 P. 2d 6; and *State v. Law*, 203 Kan. 89, 452 P. 2d 862.)

With respect to defendant's claim that Nicolay was not confined in the A & T Building at the time in question and thus committed perjury, the state responded by producing an affidavit of William R. Barker, record clerk of the penitentiary, and reproductions of the deputy warden's control cards which indicate that Nicolay was confined in the A & T Building at the time in question. Under the circumstances, it cannot be said the trial court abused its discretion in denying defendant a new trial on any of the grounds urged in connection with Nicolay's testimony.

Defendant also claims he is entitled to a new trial because of a discrepancy in officer Little's testimony which appeared when he testified in the Boster trial. In defendant's trial Little testified, on direct examination, that the photographs (exhibits 6 and 7) were taken before the cell (203) was searched. On cross-examination he admitted he was not present when the photographs were taken. In the Boster trial Little admitted that he had been mistaken as to when photographs were actually taken. In defendant's trial inmate Beltz, who took the photographs, was called as a witness for defendant. Beltz testified he took the photographs the following morning. Concerning the time of taking the photographs, Little was testifying as to his opinion and to the best of his recollection. The credibility of Little's testimony was a matter for the jury's consideration. The real issue is whether the exhibits accurately reflected the condition of the cell; as to this Little testified positively and without variance at both trials.

For his fourth claim of error, defendant contends the verdict was

contrary to the evidence. Summarized, the state's evidence discloses that Barfield died from injuries received in cell 203. The perpetrator had to be one of the three occupants of the cell. Defendant was observed with a magazine picture of a human body explaining to another inmate how a person could be killed by puncturing vital organs of the body. An argument between defendant and Barfield was overheard by an inmate of an adjacent cell about two hours prior to the discovery of Barfield. The same inmate testified that he heard a noise of scuffling and a bump like someone dropping a watermelon. The officer, who discovered Barfield, testified that he was lying on his bunk, vomiting and, obviously, in great pain. Defendant was calmly sitting on his bunk making no attempt to assist Barfield or call for aid, while Terry and Boster were in their bunks with covers over them. Evidence of two prior homicides, accomplished in a fashion so similar as to be almost identical with the methods employed in the instant case, must be considered as highly probative in identifying defendant as the perpetrator in the instant case. The evidence is ample to serve as a basis for a reasonable inference of guilt, which is the question on appellate review. (*State v. Burgess*, 205 Kan. 224, 468 P. 2d 229.)

On this point defendant makes an argument on the testimony of Boster who testified that he was the one who inflicted the wounds on Barfield in resisting an attack by Barfield after Boster had retired to his bunk. Obviously, the jury did not believe the testimony of Boster; it was within its province not to do so. This court has consistently adhered to the proposition that it is the function of a jury, not that of an appellate court on review, to weigh the evidence and pass upon the credibility of the witnesses. (*State v. Scott*, 199 Kan. 203, 428 P. 2d 458.) A defendant may not complain if the jury believed the state's witnesses, rather than his own. (*State v. Mae McLaughlin*, 207 Kan. 584, 485 P. 2d 1352.)

Finally, defendant complains that on final argument the county attorney made prejudicial statements, not supported by the evidence, in advancing a hypothetical theory of how Barfield's wounds were inflicted. In particular defendant complains the sheet or cover on Barfield's bunk was not introduced in evidence yet it was referred to by the county attorney in developing his hypothesis. True, the sheet was not introduced, but it was described by the state's witnesses who examined cell 203 and it was shown in the photographs which were admitted. In summing-up a case before a jury,

counsel may not introduce or comment on facts outside the evidence, but reasonable inferences may be drawn from the evidence and considerable latitude is allowed in the discussion of it. (*State v. Potts*, 205 Kan. 47, 468 P. 2d 78; and *State v. Lopez*, 182 Kan. 46, 318 P. 2d 662.) Defendant's complaint appears to be more of an afterthought since no objection was lodged nor was any request made to strike the objectionable statements with an admonition to the jury. It is firmly established in this jurisdiction that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument to the jury where no objection is lodged. (*State v. Fleury*, 203 Kan. 888, 457 P. 2d 44; and *State v. McDermott*, 202 Kan. 399, 449 P. 2d 545, cert. den. 396 U. S. 912, 24 L. 2d 187, 90 S. Ct. 226.)

We have carefully examined all of the contentions raised on appeal and find no prejudicial error shown.

The judgment is affirmed.